Nehemiah **MUNGIN** et al., Appellants,

v.

**FLORIDA EAST COAST RAILWAY COMPANY, Appellee.**

No. 26333.

United States Court of Appeals
Fifth Circuit.

Sept. 22, 1969.

Rehearing Denied Oct. 16, 1969.

---

Richard L. Horn, Allan Milledge, Milledge & Horn, Miami, Fla., for appellants.

Granville M. Alley, Jr., Edward J. Dinkel, III, Alley & Bush, Ronald D. McCall, Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, AINSWORTH, Circuit Judge, and FULTON, District Judge.

JOHN R. BROWN, Chief Judge:

Now rounding out a decade of industrial strife as the Nation's longest railroad strike against FEC, the history of which has been memorialized in a dozen or more Court opinions,[1] the tenth year of that turmoil once again puts Judges in the "locomotive cab." Op [1] p. 182. This time the task is easy—just getting the case back on the main line from a derail siding to which the Trial Judge's dismissal shunted it. There is nothing new here at all. Nominally the Appellants—individual workers—appear for the first time, but not really since their interests were directly presented both below and here in the Government's successful injunction suit against FEC. Ops [2], [3]. The claim is the old and judicially credited one that FEC in unilaterally changing "rates of pay, rules, or working conditions" violated § 2, Seventh and § 6 of the Railway Labor Act.[2]

1. For the following principal ones, showing post-1963 activity, we have for ease of reference substituted bracketed number-prefixes for citations, e. g., Op [1] p. —, Op [3] p. —.

Op [1]: Florida E.C. Ry. v. Brotherhood of R.R. Trainmen, 5 Cir., 1964, 336 F.2d 172, cert. denied, 1965, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611.
Op [2]: Florida E.C. Ry. v. United States, 5 Cir., 1965, 348 F.2d 682, aff'd, Brotherhood of Ry. & S. S. Clerks v. Florida E.C. Ry., Op [3], 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501.
Op [3]; Brotherhood of Ry. and S.S. Clerks v. Florida E.C. Ry., 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501, aff'g Op [2].
Op [4]: Florida E.C. Ry. v. Brotherhood of Locomotive Engineers, 5 Cir., 1966, 362 F.2d 482.
Op [5]: Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed. 2d 344.
Op [6]: Brotherhood of R.R. Trainmen v. Atlantic C.L. R.R., 5 Cir., 1966, 362 F.2d 649, aff'd by equally divided court, 1966, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20.
It rounds out the 1959–1963 history to state that it all began on November 2, 1959. At that time FEC, along with about 200 other Class I Carriers in the United States, issued two notices of contemplated work changes pursuant to § 6 of the Railway Labor Act. These notices led to conferences, mediation, litigation (see Brotherhood of Locomotive Engineers v. Baltimore & O. R.R., 1963, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759), and even the now famed statute,

Public Law 88–108, Act of August 28, 1963, 77 Stat. 132, which continues to generate nationwide litigation in the controversy precipitated by Rudolph Diesel's revolutionizing (but not exterminating) the occupation of railroad fireman and the carriers' efforts to complete the task he began by eliminating firemen from diesel engines. See Brotherhood of Locomotive Firemen & Enginemen v. Central of Ga. Ry. (Merits), 5 Cir., 1969, 411 F.2d 320; Brotherhood of Locomotive Firemen and Enginemen v. United States (Contempt), 5 Cir., 1969, 411 F. 2d 312. See also the cases cited in footnote 1 of Brotherhood of Locomotive Firemen & Enginemen v. Central of Ga. Ry., supra.

2. Section 2, Seventh states:
§ 152. General Duties—Duty of carriers and employees to settle disputes
* * *
Change in pay, rules or working conditions contrary to agreement or to section 156 forbidden
Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.
45 U.S.C.A. § 152, Seventh.
Section 6 states:
§ 156. Procedure in changing rates of pay, rules, and working conditions
Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and

The only thing new is that it is the individual members of the Union,[3] and not IARE as an entity or the national sovereign, that pursue FEC. Although this newness is so slight it is barely a ripple, much less a wrinkle, *cf.* Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 1963 A.M.C. 355, apparently it threw the switch that derailed the case into dismissal. We say apparently, for once again dismissal is by an unrevealing skeleton of an order[4] unillumined by any stated reasons except as they might be deciphered from the law's hieroglyphics—a few cited precedents. But vague as it is, it is plain enough to reveal its own error and we reverse.

Capsulating the background aids in considering the claims made in the complaint.[5] In doing so we draw freely[6] on the Complaint, the Findings of Fact and Conclusions of Law, and the Injunctive Decree in the Government's suit against FEC. Ops [2], [3]. The activities began on January 23, 1963 when 11 non-operating unions[7] went on strike against FEC. The operating unions did not strike. They did, however, honor the picket lines. FEC was forced to shut down by the strike, but, only stunned lightly, it resumed operations on February 3 by utilizing supervisory personnel and some replacement workers. Since February 3, 1963 the strike has continued but FEC has continued its operations at almost full steam using a work force less than half the size of its pre-strike level. FF 7, 8.

Now enters the Railway Labor Act, for on July 31,[8] and September 24, 1963[9] FEC issued § 6 notices to 17 craft unions.[10] In between, on September 1,

---

the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C.A. § 156.

3. International Association of Railway Employees (IARE) is the representative of the craft of Negro firemen.

4. "1. The motion of [FEC] to dismiss the complaint is granted bcause this Court lacks jurisdiction of the subject matter of this suit. See Stack v. New York Central Railroad Company, 258 F. 2d 739 (2 Cir. 1958); Smithey v. St. Louis Southwestern Railway Company, 237 F.2d 637 (8 Cir. 1956); Transcontinental & Western Air, Inc. v. Koppal,

345 U.S. 653, 661, 73 S.Ct. 906, 910, 97 L.Ed. 1325."

5. It had more than enough specificity to pass muster under Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80; Barber v. M/V "Blue Cat", 5 Cir., 1967, 372 F.2d 626, 1969 A.M.C. 211; and Pred v. Board of Public Instruction, 5 Cir., 1969, 415 F.2d 851, 852 n. 1, which brings the score up to date.

6. See FRAP Rules 30(a), (b), 10(a), (e), which permit us to consider as before us any matter of record in the Trial Court. Obviously it is not "outside" information since there is a positive identity of subject matter and practical identity of parties—FEC on one side, the employees, vicariously represented by unions or sovereign, on the other. *Cf.* Restatement, Judgments § 85 (1942). See also §§ 83, 99. The Sovereign was protecting the public interest as well as the rights of the affected employees and any question of the Government's standing to protect these interests was dispelled in Ops [2] and [3].

We shall refer to the Findings of Fact as "FF" and the Conclusions of Law as "CL".

7. Listed FF 3 n. 1.

8. FF 17 n. 3.

9. FF 9 n. 2.

10. Specifically included was IARE. FF 17 n. 3, 9 n. 2.

FEC, without filing any § 6 notice, issued what it called "Conditions of Employment," which merely codified the rules that strikebreaking employees had been working under since February 3. By these "Conditions" FEC unilaterally adopted a uniform set of rates of pay, rules, and working conditions, which were substantially different from the existing collective bargaining agreements.[11]

This was of extreme importance, for the September 24 § 6 notice [12] proposed to amend the collective bargaining agreements then in force and replace them with a new "Uniform Working Agreement," which was substantially the same as the September 1 "Conditions of Employment." The proposals were put into effect by FEC without compliance with the Railway Labor Act's mediation requirements.[13]

This brings us to the specific problem of IARE and its members as related by the complaint (see note 5, *supra*).

IARE is a party to a collective bargaining agreement with FEC which was in force on January 23, 1963. At the time of commencement of the strike FEC notified IARE that the position of fireman was abolished. Not long after operations were resumed on February 3, 1963, IARE was notified that its members were furloughed until further notice. Shortly thereafter firemen's jobs were advertised by FEC, but when IARE members submitted their bids to work, they were again told that the jobs had been abolished. A similar process of job advertisement, bid, and abolition occurred in November 1963.

In the meantime an operating Brotherhood [14] and the Government [15] had obtained injunctive orders against FEC. The Government injunction was sweeping in terms and extended to all crafts identified in the Court's footnotes 1, 2, and 3 (see notes 7, 8, 9 *supra*) including IARE. FEC was restrained from continuing in effect or implementing the changes announced in the September 24 and July 31 notices, from taking any action under the September 1 "Conditions of Employment," from making other changes in rates of pay, rules, or working conditions covered by existing collective bargaining agreements except in accordance with the procedures of the RLA. FEC was ordered to revoke all action taken under the notices and statement, to reinstate the provisions of the collective bargaining agreements, and to bargain in good faith.[16]

11. Each employee reporting for work after September 1, 1963 was required to waive his rights under the existing collective bargaining agreement for his craft or class and agree individually to accept and abide by these new "Conditions of Employment." FF 6.

12. The July 1, § 6 notice proposed to cancel and abolish the union shop provisions of its collective bargaining agreements with these unions.

13. About the only difference between the processing of IARE's notice and that of the other unions is that IARE, continuing negotiations beyond October 23, 1963, excluded itself from the Mediation Board's case No. A–7055, but after negotiations terminated on December 18, 1963, its case became A–7093. Each case was still pending when Judge Simpson issued the injunction of October 30, 1964. FF 11, 10, 13, 18.

14. The Brotherhood injunction was entered on March 7, 1964 and affirmed with modification on August 18, 1964. Op [1].

15. The Government injunction was entered on October 30, 1964 and affirmed with modification by us on July 21, 1965, Op [2], and by the Supreme Court May 23, 1966, Op [3].

16. "ORDERED, ADJUDGED AND DECREED:

1. That [FEC is] enjoined and restrained, until further Order of this Court, from:

(a) in any manner continuing in effect or implementing in any respect the changes in rates of pay, rules or working conditions announced in FEC's notices of September 24, 1963, and July 31, 1963, except by agreement with the labor organizations representing the several crafts or classes of FEC's employees affected by said notices, or until the controversies have been finally acted upon by the National Mediation Board, as provided in

But despite this Government injunction, the Complaint went on, FEC presumably trying to show compliance with it, advertised some firemen's jobs and accepted some bids. By the institution of discriminatory physical examinations, however, not only all firemen but virtually all returning operating employees were disqualified from return.[17] But FEC had other weapons in its arsenal. On September 2, 1965, on the eve of Judge Simpson's finding FEC in contempt for this discriminatory examination gambit,[18] FEC obtained and executed an agreement with the IARE president. The president (who under the constitution of that organization did not have authority to sign such an agreement) purported that to agree that the firemen had in fact been physically unfit and purported to settle outstanding disputes with the IARE. Not surprisingly that agreement was set aside as null and void in its entirety on August 8, 1967.[19] But that helped little for since the execution of the 1965 illegal agreement, the few firemen allowed to return to work have been forced immediately to take a promotion to engineer,[20] and no one has been permitted to work as a fireman since that time.

The complaint winds up with wholly unnecessary but now time and time again judicially credited, charges [21] in railroad

Sections 5 and 6 of the Railway Labor Act (45 U.S.C. 155, 156);

(b) taking any action under any further notice attempting to make changes in rates of pay, rules or working conditions, except in accordance with the procedures of Section 6 of the Railway Labor Act (45 U.S.C. 156);

(c) in any manner continuing in effect or taking any action under FEC's 'Conditions of Employment' promulgated September 1, 1963, except by agreement with the labor organizations representing the several crafts or classes of FEC's employees;

(d) making or continuing in effect any individual agreements with FEC's employees in any craft or class for which a collective bargaining representative has been designated, except in accordance with the provisions of the collective bargaining agreement for said craft or class; or

(e) making any other changes in rates of pay, rules or working conditions of its employees in crafts or classes covered by existing collective bargaining agreements except in accordance with the procedures of the Railway Labor Act or except upon specific authorization of this Court after a finding of reasonable necessity therefor upon application of the FEC to this Court during the pendency of the current strike.

2. The Defendant, Florida East Coast Railway Company (FEC), its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, are further mandatorily required and directed, until further Order of this Court,

(a) to revoke, cancel and annul all action taken and notices given purporting to put into effect the changes in rates of pay, rules and working conditions proposed in FEC's notices of July 31, 1963, and September 24, 1963, and in its 'Conditions of Employment' of September 1, 1963;

(b) to reinstate and maintain the rates of pay, rules, and working conditions as embodied in existing collective bargaining agreements covering its employees until and unless said agreements are modified in accordance with the procedures of the Railway Labor Act or until and unless specifically authorized on application therefor by this Court; and

(c) to bargain in good faith with the labor organizations representing the crafts or classes of FEC's employees."

17. Other operating craft unions thereupon brought contempt proceedings in the main injunctive lawsuit against FEC.

18. Brotherhood of Locomotive Engineers v. Florida E.C. Ry., M.D. Fla., 1965, No. 64–239–Civ–J [Order on Rule to Show Cause, Sept. 24, 1965].

19. Harrison v. Florida E.C. Ry., M.D. Fla., 1967, No. 65–366–Civ–J.

20. Such promotion was not provided for in the FEC–IARE Agreement and had never previously been permitted.

21. See Op [1], Op [2], Op [3]. See also Conclusions of Law (note 6 *supra*) declaring the dispute to be a "major" one (CL 3); unilateral action under the July 31, September 24, 1963 notices violated §§ 2, Seventh, 5, First, and 6 (CL 5); initiation of September 1, 1963 working conditions violated §§ 2, First, Second, Seventh, § 5, First, and § 6 (CL 6); exaction of individual agreements for pay, etc. different from bargaining agreements vio-

legalese, that FEC by this course of conduct has violated § 2, Seventh and § 6 of the Railway Labor Act and has abrogated the collective bargaining agreement in effect between FEC and IARE.[22]

Jurisdiction was formally claimed to exist under 28 U.S.C.A. § 1331[23] as a federal question with more than $10,000 in dispute, and under § 1337 as a case arising under a commerce law.[24]

Although, for the reasons we state, the question of jurisdiction is to us very simple, we expand the factual treatment and our reasons because Judge Scott, who has given such careful superintendence to his railroad duties, Op [1] p. 182, Op [2] p. 686, as successor

to Judge Simpson[25] apparently was overly influenced by two factors troubling to him. The first was that the suit was by employees, not by a union, and the second was that the relief formally prayed for was a money award. As a part of the second, there was the emphasis, repeated several times in the complaint,[26] but which our treatment of the Government's suit proves to be demonstrably unfounded, that IARE and its members were not the beneficiaries of any injunction, so that a money award, not contempt, would be the only effective sanction. The Judge was, of course, responding to like advocative contentions made by FEC which took an even more technical turn. Thus, FEC's brief emphasizes that in the allegations[27] there

---

lated §§ 2, First, Second, Seventh, § 5, First, and § 6 (CL 7).

22. "FEC's past and continuing violation of the Railway Labor Act by completely abrogating the IARE–FEC agreement has totally frustrated the purposes and operations of said Act, and has resulted in direct and proximate monetary loss" to members of IARE.

23. "§ 1331. Federal question; amount in controversy; costs
    (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."
    28 U.S.C.A. § 1331(a).

24. "§ 1337. Commerce and anti-trust regulations
    The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."
    28 U.S.C.A. § 1337.

25. Judge Simpson joined the Fifth Circuit on November 22, 1966.

26. The Complaint states:
    "In 1964, the FEC operating and non-operating craft unions, (with the exception of IARE) and the United States Government brought lawsuits against FEC to prevent FEC from further operation in violation of the Railway Labor Act and collective bargaining agreements.

"Injunctive orders were issued by the United States District Court, Middle District of Florida * * *.
    *    *    *    *    *    *    *
    "Since IARE was not among the craft unions which had obtained such injunctive orders, FEC continued its operation without locomotive firemen and continued its unlawful failure and refusal to allow plaintiff to work as a locomotive fireman.
    *    *    *    *    *    *    *
    "In December, 1964, FEC advertised some firemen's jobs. Certain locomotive firemen's bids were accepted and they were ordered to take physical examinations. In virtually every instance, by the application of FEC's discriminatory standard, said locomotive firemen were found unfit to perform locomotive firemen duties. Since IARE had no lawsuit or injunctive order obtained on their behalf, no contempt action was brought."

27. They single out:
    (Paragraph 25)
    "FEC * * * had engaged * * * in the * * abrogation of the collective bargaining agreement in effect between IARE and FEC * * *."
    (Paragraph 26)
    "As a * * * result of said * * * abrogation of said collective bargaining agreement, Plaintiff has suffered the deprivation of * * * his lawful rights, including his right to work as a locomotive fireman * * * under * * * said agreement."
    (Paragraph 27)
    "FEC's past and continuing violation of the Railroad Labor Act by * * * abrogating the IARE–FEC agreement

is an "absence of any reference to 'back-pay' or prayer for maintenance of the 'status quo' [and] * * * the allegations * * * show that the [IARE members] were seeking to recover damages for * * * breach of the contract and the Railway Labor Act."[28]

There are a number of things wrong with this approach. First, keeping in mind the *Conley-Gibson* concept (note 5, *supra*), which permits dismissal on pleadings only when to a certainty no facts can be brought forward on which to base relief, the one thing that is certain from Ops [1], [2], and [3] and the Findings of Fact and Conclusions of Law approved by Ops [2] and [3] is that all of this conduct, of which IARE was but one of several targets or subjects of FEC unilateral action, was in flagrant violation of the Railway Labor Act. Thus, whether the members of IARE seek injunctive relief or not, they can establish this patent violation which resulted in not just a breach of contract but a complete abrogation of the collective bargaining agreement. By Ops [1], [2], and [3] it is clear that for such conduct the courts may grant suitable relief. The second thing wrong with FEC's attack is that once the question of relief is approached, several subsidiary factors become significant. At the outset, subject matter jurisdiction seldom depends on the precise relief sought. The caboose does not run the train. Next, that brings into play F.R.Civ.P. 54(c)[29] which, once an answer or motion is filed, makes relief dependent not on the prayer but on what the facts show to be appropriate. Consequently it is out of keeping both with the spirit of *Conley-Gibson* (see note 5, *supra*) and Rule 54(c) to permit at this late stage a hypercritical reading of the complaint and to hold, as would FEC (and perhaps the Trial Judge), that a demand for a money award would not encompass one for the payment of the same sort of dollars under the remedial category of "backpay". Indeed, these principles still leave open to the Trial Court on remand whatever other or further relief is appropriate, including with suitable protections, the equivalent of reinstatement, backpay, injunctions and the like.

Of course these basic errors in procedural approach led to like substantive errors. This was not a relatively simple case of the type reflected in the cases cited by the Trial Court (see note 4, *supra*) where relief is asked by reason of a discharge which might constitute a breach of the contract and the Railway Labor Act and there is a requirement to exhaust grievance, or Railway Board of Adjustment, remedies. Nor was it one making a *Hettenbaugh*[30] attack.

---

* * * has resulted in direct and proximate monetary loss to Plaintiff." (Paragraph 28)
"FEC's * * * violation of the Railroad Labor Act * * * and its continuing abrogation of the IARE–FEC collective bargaining agreement has been and is * * * calculated to deprive Plaintiff of his lawful rights."

**28.** FEC brief at 7, 8.

**29.** "(c) Demand for Judgment. A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

F.R. Civ. P. 54(c).

We have given full voice to this rule. See Equity Capital Co. v. Sponder, 5 Cir., 1969, 414 F.2d 317, 319 n. 1; Molnar v. Gulfcoast Transit Co., 5 Cir., 1967, 371 F.2d 639; Burton v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1964, 335 F.2d 317; South Falls Corp. v. Rochelle, 5 Cir., 1964, 329 F.2d 611; Smoot v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1962, 299 F.2d 525.

**30.** Hettenbaugh v. Airline Pilots Ass'n, 5 Cir., 1951, 189 F.2d 319. Considering all that has happened in this dynamic field since 1951 we need not consider just how much is, left to that holding, but it is plain that the opinions emphasis, that it "is only when collective bargaining agreements are unlawfully entered into, or when the agreements themselves are unlawful in terms or effect, that federal

Rather, this case, as those in Ops [1], [2], [3], and [4], is one in which there was a complete abrogation of the collective bargaining agreement and an unlawful substitution of new working conditions including here the abolition of a craft—firemen. In words which discussed many of these very actions taken by FEC, and which parallel those taken toward IARE, we have already declared that this is a major dispute and that Federal Courts are open to grant appropriate relief.[31]

This IARE case is no less a major dispute or one arising under 28 U.S.C.A. § 1337 (see note 24, *supra*) simply because the prayer is cast initially in terms of a money award.

If—and the if is a little one—there was some doubt on subject jurisdiction, it was all dispelled by International Ass'n of Machinists v. Central Airlines, Inc., 1963, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67, which reversed this Court, 5 Cir., 1961, 295 F.2d 209 in its jurisdictional holding that a suit to enforce the award of a Systems Board of Adjustment was not within the federal jurisdiction since such "suit is nothing more than a state-created action to construe a contract," 295 F.2d 209, 220; 372 U.S. 682, 684, 83 S.Ct. 956, 958, 10 L.Ed.2d 67, 70. After analyzing the necessity for national uniformity in the administration of the Railway Labor Act,

the Supreme Court, holding that all subsidiary questions were for determination by federal law or federal principles, rejected the restrictive approach of Gully v. First National Bank and similar cases on the "arising under" standard of §§ 1331 and 1337:

"The contract of the parties here was executed under § 204 and declares a system board award to be final, binding, and conclusive. The claim stated in the complaint is based upon the award and demands that it be enforced. Whether Central must comply with the award or whether, instead, it is impeachable, are questions controlled by federal law and are to be answered with due regard for the statutory scheme and purpose. To the extent that the contract imposes a duty consistent with the Act to comply with the awards, that duty is a federal requirement. If Central must comply, it is because federal law requires it compliance.

In the circumstances we have here, we are not dealing with a suit involving an aspect of federal law which is only collateral or remote or a case where state and federal laws are so blended as to present a serious question of the scope of the arising-under provision of § 1331 or § 1337. See Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65

---

courts may act," is way too narrow a description of the situations in which Railway Labor Act violations loosen federal jurisdiction.

31. Op [1] states:
"First, we think that this is clearly a so-called 'major dispute' within the meaning of the decisions of the Supreme Court and this Court. (citations omitted). This is not a case * * * involving a dispute as to whether the agreement authorizes action taken by the Carrier. Neither is it a case involving a dispute over the meaning of the terms relating to rates of pay, hours, and working conditions. Rather, this is a case in which a Carrier has unilaterally instituted wholesale changes in these terms, changes which, in negotiations presently going on with re-

spect to the September 25 notice, it seeks to establish permanently. The bulk of the changes were instituted on February 3, 1963, with no pretense at compliance with the Act. * * * Employees hired after September 1, 1963, were made to sign the 'Conditions of Employment' which formally reduced to writing the changes of February 3, 1963. Again, this was done with no pretense of compliance with the Act. Finally on September 25, 1963, the FEC served a § 6 Notice with respect to those changes. Whether the strike conditions do justify the changes in whole or in part is admittedly a difficult question, but neither the presence of the question nor its difficulty changes the character of the dispute from 'major' to 'minor.'"
Op [1] p. 178–79.

L.Ed. 577; Gully v. First Nat. Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70; Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194; Romero v. International Term. Co., 358 U.S. 354, 393, n. 4, 79 S.Ct. 468, 491, 3 L.Ed.2d 368, 394 (dissenting and concurring opinion). In our view the complaint in this case, for jurisdictional purposes, presented a substantial claim having its source in and arising under the Railway Labor Act and the District Court therefore has jurisdiction under 28 USC § 1331 if the jurisdictional amount is satisfied and in any case under § 1337. Romero v. International Term. Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368; Montana-Dakota Utilities Co. v. Northwestern P. S. Co., 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 [917]; American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 [989]."

Equally decisive, both on the question of jurisdiction and on the question of remedy, are the *Galveston Wharves* cases of this Court.[32] Because the effect of the leasing of the elevator was to terminate the collective bargaining contract with the Union, we held in *Galveston Wharves I* that this result without prior compliance with the negotiation-mediation provisions of the Act was illegal and subject to Federal Court intervention. Although an injunction against the lease itself was sought, this was not granted. We remanded the case for the imposition of "some suitable relief and sanction." 351 F.2d at 191–192. Showing that the molding of relief was no mechanical proposition, *Galveston Wharves II* held that the order to bargain was insufficient.

368 F.2d at 413. In *Galveston Wharves III* we reversed the Trial Court's third holding that, in effect, the back wages portion of the relief was a pure contract claim which called for Railway Adjustment Board processing (much as did the District Court here, see note 4, *supra*). We held that the Federal Court "has authority to require payment of backpay as a sanction for the Carrier's having violated Section 6" of the Act. 400 F.2d at 323. We pointed out that "the purpose of the revelant sections of the Act is maintenance of the status quo pending conference. The employees wrongfully laid off cannot be retroactively reinstated, but they can be retroactively compensated. This does not punish the Carrier. Nor does it constitute a windfall to the employees. It is the price of reconstructing the status quo; it compensates the employees for the losses incurred by their being laid off in violation of the Act." 400 F.2d at 325. And as though written for IARE–FEC we said, "The Carrier's error stems from its premise that '[i]f the members of this Union are entitled to backpay, it is because they were wrongfully discharged.'" 400 F.2d at 326. Rejecting the minor dispute contention, we went on in words which match this case perfectly, "But the employees here do *not* claim backpay for a breach of contract. Their claim arises out of a violation of the federal statute. The contract-dispute cases therefore are not relevant." 400 F.2d at 327.

A suit for money award encompasses backpay. It encompasses also, if appropriate, reinstatement and reconstruction, so far as practicable, of the status quo.[33]

---

32. United Indus. Workers v. Board of Trustees of Galveston Wharves, 5 Cir., 1965, 351 F.2d 183 (Galveston Wharves I); United Indus. Workers v. Board of Trustees of Galveston Wharves, 5 Cir., 1966, 368 F.2d 412 (Galveston Wharves II); United Indus. Workers v. Board of Trustees of Galveston Wharves, 5 Cir., 1968, 400 F.2d 320, cert. denied, 1969, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (Galveston Wharves III).

33. The wisdom, if not necessity, of our holding is demonstrated by the fact that if full relief were not accorded, FEC would effectually secure a departure from pre-February 3, 1963–September 24, 1963 conditions without ever having sought or obtained the right to interim departure. See Op·[2] p. 684.

So much would surely have been mandated had this suit been brought by IARE. Is it any different now that it was brought by the members?

■■ We start with the proposition that the Railway Labor Act calls for *collective* action. Once it has been taken, no member of the craft has any right or power to alter the specified working conditions. Neither the employee nor a group of employees may alter or waive prescribed provisions until the agreement is changed by processes under the Act. Op. [1] p. 180 and n. 24, citing Order of R. R. Telegraphers v. Railway Express Agency, 1944, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788; Op [3]. This carries out the statutory scheme that bargaining is by the majority representative and once done it is for all and binds all. Indeed it must be done fairly for all craft members whether members of the Union or not. Steele v. Louisville & N. R.R., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173.

This record bears out why, in effectuating congressional objectives, the law must accord to employees the right, if not the duty, of asserting on behalf of craft members their rights under the Act where from disloyalty, corruption, or other influences the Union has failed in its duty of faithful representation.[34] (See note 19 and related text, *supra*).

Consequently, with a suit of multiple, but individual, parties comprising a substantial number of the members of the craft, we hold that it was a claim both for individual relief and, even more so, a claim on behalf of the entire craft whether represented or not.

The case must therefore go back for further proceedings including the granting of whatever relief is appropriate to vindicate the rights under the Railway Labor Act.

Reversed and remanded.

34. Undoubtedly where there is vigorous controversy in the litigation between the Union and members seeking to intervene, etc., the Court must determine to what extent or upon what terms it will deal with such dual voices. *Cf.* Acuff v. United Papermakers and Paperworkers, 5 Cir., 1968, 404 F.2d 169, cert. denied, 394 U.S. 987, 89 S.Ct. 1466, 22 L.Ed.2d 762.