In re CONTINENTAL AIRLINES
CORP., et al., Debtors.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL and James C.
Stephens, et al., Appellants,

v.

CONTINENTAL AIRLINES, INC.,
et al., Appellees.

O'NEILL GROUP, Appellants,

v.

CONTINENTAL AIRLINES, INC.,
et al., Appellees.

UNION OF FLIGHT
ATTENDANTS, Appellant,

v.

CONTINENTAL AIRLINES, INC.,
et al., Appellees.

No. 89–2347.

United States Court of Appeals,
Fifth Circuit.

May 25, 1990.

Randolph J. Haines, Marty Harper, Allen Clarke, Jessica Franken, Lewis & Roca, Phoenix, Ariz., for appellants.

Reginald H. Wood, William Schweinle, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Houston, Tex., for O'Neil Group.

James R. O'Donnell, Leon V. Komkov, Butler & Binion, Houston, Tex., for Stephens Group.

Barbara Gardner, Mandell & Wright, Houston, Tex., Bruce Simon, Babette Ceccotti, Cohen, Weiss, & Simon, New York City, Kathleen M. Schaden, Schaden, Heldman & Lampert, Denver, Colo., Christopher Cameron, Taylor, Roth, Bush & Geffner, Burbank, Cal., Daniel P. Casey, Continental Airlines, Inc., Houston, Tex., for appellees.

John J. Gallagher, Charles L. Warren, Jon A. Geier, Aiken, Gump, Strauss, Hauer & Feld, Washington, D.C., Lenard Parkins, Sheinfeld, Maley & Kay, Houston, Tex., for Continental Airlines, Inc.

Before GEE, REAVLEY, and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

██ Today's case presents the question whether employees whose collective bargaining agreements are rejected in a Chapter 11 bankruptcy are entitled to future wages and benefits as contract rejection damages under 11 U.S.C. § 502(g). Recognizing that the agreements here at issue do not guarantee employment, we hold that the difference between the wages and benefits set out in the agreements and the wages and benefits actually paid under the emergency work rules are recoverable as unsecured claims to the extent that work would have been available had the agreements not been rejected. The bankruptcy court dismissed all employee claims without considering how long Continental could have remained in business absent rejection of the agreements. For this and other reasons to be stated, we reverse and remand the cause to the bankruptcy court to allow it to make a specific finding of when Continental would have had to cease operations had it not cancelled its labor contracts, and to calculate appropriate damages to that date.

## I. *Facts*

In 1983, Continental halted domestic flight operations and filed a bankruptcy petition under Chapter 11. Continental then filed a motion in bankruptcy court to reject its labor contracts with the Air Line Pilots Association, International ("ALPA")

and the Union of Flight Attendants ("UFA") pursuant to 11 U.S.C. Section 365. That same day, Continental recommenced its domestic flights under what it termed "Emergency Work Rules," rules that changed dramatically the employees' terms and conditions of employment. As a result, ALPA and UFA called strikes.

The bankruptcy court approved Continental's rejection of its labor contracts with ALPA and UFA and ordered the rejection effective the date of the bankruptcy filing. ALPA and UFA then filed proofs of claim, in amounts of $408 million and $409 million respectively, for contract rejection damages under 11 U.S.C. Sections 365(g) and 502(g). These claimed damages consisted of the full wages and benefits set forth in the rejected labor contracts, for time periods beginning from the date of the bankruptcy filing up to and somewhat beyond the contracts' amendable dates.

In October of 1985, Bankruptcy Judge T. Glover Roberts, acting by agreement between Continental and ALPA, signed an "Order and Award" that was intended to settle all issues between Continental and ALPA, including the contract rejection damage claims. Because of objections raised by certain individual pilots, the court allowed pilots who did not participate in the settlement to file proofs of claim and pursue their derivative share of the claims originally filed by ALPA. A like settlement agreement was reached between Continental and UFA, with a procedure created which was similar to that for the pilots, allowing non-settling flight attendants to pursue their claims independently of UFA. In all, approximately 460 pilots and 14 flight attendants have filed proofs of claim seeking contract rejection damages under the procedures established by the bankruptcy court.

In a motion for partial summary judgment, Continental next asked the bankruptcy court to disallow contract rejection damages claims for the time that the employees were on strike. When that motion was granted on September 10, 1985 ("September 10 Order"), Continental filed an additional motion for summary judgment seeking to disallow the remaining claims for contract rejection damages. This was granted as to the claims of the flight attendants on May 8, 1986 ("May 8 Order"), and as to the pilots' claims on June 26 of the same year ("June 26 Order"). The court reasoned that as the collective bargaining agreements did not guarantee employment, the claimants were not entitled to future wages and benefits as contract rejection damages. The orders were appealed to federal district court, which affirmed them.

## II. *Discussion*

### A. Failure to Stand Recused

The appellants contend that Judge Roberts, who shortly after making his May 8 and June 26 orders received and accepted an offer for partnership in the law firm representing Continental, should have stood recused from the case and that his failure to do so requires the reversal of those orders.

Several months before making his rulings in this case, Judge Roberts had announced his intentions to enter private practice and to stop handling the Continental bankruptcy cases to avoid conflicts of interest in the event he considered employment with any of the firms appearing before him. Shortly thereafter, Continental's local bankruptcy counsel, Messrs. Sheinfeld, Maley & Kay ("Sheinfeld"), discussed hiring Judge Roberts at a partnership meeting. Before his confirmation of Continental's plan of reorganization, at least two Sheinfeld lawyers had asked Judge Roberts about his future employment plans. At about the same time, Judge Roberts was quoted as praising Continental's President Frank Lorenzo in articles which appeared in Business Week and the Wall Street Journal.[1]

---

1. Judge Roberts was reported to have said concerning Frank Lorenzo: "'Who do you know with the guts to put half a billion dollars on the table and say he can do a turnaround' of a company that is a prime candidate for bankruptcy.... If anybody can do it, Lorenzo can." *Frank Lorenzo, High Flier*, Business Week, March 10, 1986 at 104, 107.

Judge Roberts granted summary judgment disallowing all contract rejection damage claims in orders made on May 8 and June 26, 1986, and confirmed Continental's plan of reorganization on June 30. On July 1, Judge Roberts granted various fee requests made by counsel, including a $700,000 fee to Sheinfeld. On July 2, Sheinfeld contacted Judge Roberts about joining their partnership. On July 29, Judge Roberts agreed to join the firm and did so on September 5 of the same year.

■ 28 U.S.C. Section 455(a) requires a judge to stand recused "in any proceeding in which his impartiality might reasonably be questioned." Because the goal of Section 455(a) "is to exact the appearance of impartiality," recusal may be mandated even though no *actual* partiality exists. *Hall v. Small Business Admin.*, 695 F.2d 175, 178 (5th Cir.1983). The standard for recusal is an objective one, that if a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Health Services Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir.1986), *aff'd*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

■ In the present case there is no allegation that, prior to his rulings in this case, Judge Roberts had sought employment with the Sheinfeld firm, or that he knew that the firm was actively considering him. The close coupling of Judge Roberts's rulings with the employment offer and his acceptance of it, however, does create the appearance that he may have been pursuing employment with Sheinfeld while he was presiding over the case. As the Seventh Circuit noted in *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 461 (7th Cir.1985):

> The appearance of equal justice requires that the judge not be exploring the prospects of employment with one lawyer or all lawyers appearing in a case before him. The dignity and independence of the judiciary are diminished when the judge comes before the lawyers in the case in the role of a suppliant for employment. The public cannot be confident that a case tried under such conditions

will be decided in accordance with the highest traditions of the judiciary.

*Id.* at 461.

Continental contends that a judge cannot be expected to stand recused in a case when he is unaware that counsel for one of the parties appearing before him is considering him for employment. The Supreme Court, in *Liljeberg v. Health Services Corp.*, responded to a similar contention:

> Contrary to petitioner's contentions, this reading of the statute does not call upon judges to perform the impossible—to disqualify themselves based on facts they do not know. If, as petitioner argues, § 455(a) should only be applied prospectively, then requiring disqualification based on facts the judge does not know would of course be absurd; a judge could never be expected to disqualify himself based on some fact he does not know, even though the fact is one that perhaps he should know or one that people might reasonably suspect that he does know. But to the extent the provision can also, in proper cases be applied retroactively, the judge is not called upon to perform an impossible feat. Rather, he is called upon to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary. If he concludes that "his impartiality might reasonably be questioned," then he should also find that the statute has been violated. This is certainly not an impossible task.

486 U.S. 847, 861, 108 S.Ct. 2194, 2202–03, 100 L.Ed.2d 855, 873 (1988). Similarly, to hold that § 455(a) was violated in the present case does not mean that Judge Roberts was required to stand recused before discovering that he was being considered for employment. Rather, when an offer of employment was received the day after his approval of $700,000 in legal fees to the firm making the offer, Judge Roberts was "required to take the steps necessary to maintain public confidence in the judiciary." In the circumstances of this case Judge Roberts should either have rejected the offer outright, or, if he seriously desired to consider accepting the offer, stood recused and vacated the rulings

made shortly before the offer was made. Although we are confident that Judge Roberts committed no substantive impropriety in his handling of the motions in this case, we nevertheless conclude that recusal was mandated by the appearances of the situation which we have described.

■■■ Although a violation of § 455(a) has occurred in the present case, reversal is not automatic. As with other areas of the law, the "harmless error" rule applies to a breach of a judge's duty to stand recused under § 455(a). *Liljeberg,* 486 U.S. at 861–62, 108 S.Ct. at 2202–03, 100 L.Ed.2d at 873–74. In determining whether reversal is mandated by a failure to stand recused, a number of factors warrant our careful consideration: The risk of injustice to the parties in this particular case; the risk that the denial of relief will produce injustice in other cases; the risk of undermining the public's confidence in the judicial process. *Id.* at 864, 108 S.Ct. at 2204, 100 L.Ed.2d at 875.

■ The risk of injustice to the parties in allowing a summary judgment ruling to stand is usually slight. Such rulings are subject to de novo review, with the reviewing court utilizing criteria identical to that used by the court below. In cases where we would otherwise affirm such a ruling, little would be gained by vacating and remanding with instructions that it be essentially reinstated.[2]

Next, we consider whether a failure to vacate the orders below would be likely to produce injustice in other cases. We seriously doubt that a failure to vacate the decisions of the bankruptcy court could be read in future cases as a nod of approval for Judge Roberts's handling of the situation; rather, our ruling here should serve as a caution to other judges who are contemplating private employment following retirement. Moreover, were we to vacate

the orders below for the § 455 violation alone, injustice to other Continental creditors might result from the delay in finishing Continental's plan of reorganization.

Finally, we consider whether the public's confidence in the judicial process will be undermined if we hold Judge Roberts's violation of Section 455(a) to be harmless error. We are aware of the high profile the Continental bankruptcy has had before the public and that the circumstances surrounding Judge Roberts's retirement from the bench have not gone unnoticed by the press.[3] That we have ruled Judge Roberts's actions to be violative of Section 455(a) should serve to restore some of any public confidence lost as a result of the violation; whether vacating the orders granting summary judgment for the sake of appearances alone would help or hinder the restorative process, however, is not clear. As the Eleventh Circuit has noted, in similar circumstances:

> In fact, if we reverse and vacate a decision that we have already determined to be proper, the public will lose faith in our system of justice because the case will be overturned without regard to the merits of the employees' claims. Judicial decisions based on such technical arguments not relevant to the merits contribute to the public's distrust in our system of justice.

*Parker v. Connors Steel Co.,* 855 F.2d 1510, 1527 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). We accordingly hold that the Section 455(a) violation in the present case constituted harmless error.

**B. Contract Rejection Damages**

Bankruptcy Code Section 365 permits an employer to reject a collective bargaining agreement and set new terms and conditions of employment. 11 U.S.C. § 365; *NLRB v. Bildisco & Bildisco,* 465 U.S. 513,

---

**2.** The Eleventh Circuit noted in a similar situation:

> As discussed previously, we agree with the district court that summary judgment was proper. It would, therefore, be ridiculous to remand this case and reassign it to another judge after we have already exercised plenary

review and have concluded that summary judgment was proper.

*Parker v. Connors Steel Co.,* 855 F.2d 1510, 1526 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989).

**3.** *See* Texas Lawyer, Dec. 1–5, 1986, at 1; Wall St. J., Oct. 6, 1986, at 24, col. 1.

531, 104 S.Ct. 1188, 1198–99, 79 L.Ed.2d 482 (1984). When so rejected, the agreement is deemed breached the day before the Chapter 11 petition was filed. 11 U.S.C. § 365(g). Section 502(g) provides a remedy for this breach in lieu of the labor law remedies which would have been available outside bankruptcy. The appellants contend that, in addition to accrued wages and benefits, future wages and benefits are recoverable as of right as Section 502 contract rejection damages.

 In support of their contention that the district court erred in rejecting their damage claims, the appellants rely principally upon *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1983), in which the Supreme Court held that the authority of a debtor-in-possession to seek the rejection of a collective bargaining agreement was not subject to the modification restrictions of Section 8(d) of the NLRA. In a footnote the Court stated that the "losses occasioned by the rejection of a collective-bargaining agreement must be estimated, including unliquidated losses attributable to fringe benefits or security provisions like seniority rights." *Id.* at 530 n. 12, 104 S.Ct. at 1198 n. 12. The appellants read this portion of the opinion as mandating the award of contract rejection damages whenever a collective bargaining agreement is breached. The plaintiffs fail to recognize, however, that this footnote was simply the Court's attempt at clarifying Section 502(c), which requires the estimation of unliquidated claims *if such are otherwise recoverable.* *Id.* at 530, 104 S.Ct. at 1198. Whether certain types of damages are recoverable under Section 502 will depend upon the particular contract at issue and the circumstances surrounding its rejection.

1. Collective bargaining agreements

 Unlike a contract of employment, ordinarily a collective bargaining agreement does not create an employer-employee relationship; and its rejection does not terminate an employment relationship. It neither obligates any employee to perform work nor requires the employer to provide work. It is simply "a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plan." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964). As has been noted by the Supreme Court:

> [C]ollective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to the terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment.

*J.I. Case Co. v. National Labor Relations Board*, 321 U.S. 332, 335, 64 S.Ct. 576, 579, 88 L.Ed. 762 (1944). Unless a collective bargaining agreement guarantees future employment, lost future wages and benefits as damages for its breach are not recoverable in periods when no work would have been available. *See, e.g., NLRB v. Biscayne Television Corp.*, 337 F.2d 267, 268 (5th Cir.1964); *Nabors v. NLRB*, 323 F.2d 686, 690 (5th Cir.1963), *cert. denied*, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964); *NLRB v. Columbia Tribune Publishing Co.*, 495 F.2d 1384, 1393 (8th Cir. 1974).[4] Likewise, employees working under such an agreement are not entitled to lost future wages if the employer ceases operations. *See, e.g., J.I. Case, supra; Fraser v. Magic Chef–Food Giant Markets, Inc.*, 324 F.2d 853 (6th Cir.1963); *Bak-*

---

**4.** Although these cases were decided under the NLRA (the present contract is governed by the RLA), courts have often looked to decisions under the NLRA for guidance in RLA matters. *See generally Trans World Airlines, Inc. v. Inde-* *pendent Federation of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 1117–18, 22 L.Ed.2d 344 (1969).

*ery & Confectionary Workers Intern. Union of America v. Great Atlantic & Pacific Tea Co.*, 357 F.Supp. 1322 (W.D.Pa.1973), *aff'd mem.*, 491 F.2d 748 (3d Cir.1974); *Abbington v. Dayton Malleable, Inc.*, 561 F.Supp. 1290 (S.D.Ohio 1983), *aff'd mem.*, 738 F.2d 438 (6th Cir.1984).

The collective bargaining agreement in the present case provides no guarantees of continued employment. Hence, even if the present agreement had not been cancelled, damages would only be available for the time Continental would have been able to continue in business. In rejecting all of the appellants' damage claims, Judge Roberts relied upon a previous finding, not here appealed, "that had Continental not made its unilateral changes in pilot pay and work rules[ ] it would have been unable to continue its operations for very much longer for want of necessary cash," and that absent the implementation of the September 27 Emergency Work Rules, "Continental would have run ... [out] of cash" and "would have had to shut its doors even before this hearing commenced," that date being January 30, 1984. Recognizing that if Continental went out of business, the employees would have no damage claims under the agreement, Judge Roberts held that no damages should be available under Section 502(g). Although the reasoning utilized by Judge Roberts in rejecting the claims parallels our own here, he failed to recognize that the finding relied upon suggests that Continental *could have* continued to operate under its labor contracts for *some* period of up to four months following September 27, 1983. As the employees operating under the agreement would have had a claim for damages—accruing until Continental ceased operations—had the contract not been rejected, they are entitled to contract rejection damages for the same period. These damages are to be considered unsecured claims measured by the differences in the rates of pay and fringe benefits set forth in the agreements and the pay and benefits actually received under the Emergency Work Rules.

5. In a previous order not here appealed, the bankruptcy court held that Continental's action in rejecting its collective bargaining agreements

2. Effect of the strike

The appellants contend that contract rejection damages should be available for the time the employees were out on strike. As noted above, the purpose of Section 502(g) is to give the same remedy as would be available had the contract not been rejected. Absent constructive dismissal by the employer,[5] employees who strike are not ordinarily entitled to back pay for the period for time they are on strike, even if the strike is in response to an unfair labor practice. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 198 n. 7, 61 S.Ct. 845, 854 n. 7, 85 L.Ed. 1271 (noting that the NLRB does not award backpay for an unfair labor practice strike); *J.H. Rutter–Rex Manuf. Co. v. NLRB*, 399 F.2d 356, 361 (5th Cir.1968), *rev'd on other grounds*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969) (liability for backpay to unfair labor practice strikers begins with application for reinstatement); Studio 44, Inc., 284 N.L.R.B. No. 67 at 13 n. 22 (1987) ("It is well settled that unfair labor practice strikers are not entitled to reinstatement and backpay until they have made an unconditional offer to return to work"); Comfort, Inc., 152 N.L.R.B. 1074, 1090 (1965), *enforced*, *NLRB v. Comfort, Inc.*, 365 F.2d 867 (8th Cir.1966). As no damages would have been available to Continental employees for the time when they were on strike outside of bankruptcy, none should be given in this instance.

The cases relied upon by the appellants do not dictate a different outcome. For example, the appellants cite our decisions in *Mungin v. Florida East Coast Railway Co.*, 416 F.2d 1169 (5th Cir.1969) and *United Industrial Workers v. Board of Trustees of Galveston Wharves*, 400 F.2d 320 (5th Cir.1968), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), in support of their contention that a back pay remedy is available for striking employees. In both of these cases the disputed actions of the carriers constituted violations of § 6

did not constitute a constructive discharge. *In re Continental Airlines Corp.*, 57 B.R. 845 (Bankr.S.D.Tex.1985).

of the Railway Labor Act, for which we ruled that back-pay could be awarded as a sanction, calculated from the time of the wrongful discharge until the employees were reinstated pending bargaining. *Id.* at 328. We noted that the purpose of the sanction was to recreate, so far as possible, the status quo before the wrongful action was taken and to maintain it until the carriers complied with the good faith bargaining required by § 6 of the Act. *Id.* at 329.

The plaintiffs' reliance upon *Mungin* and *Galveston Wharves* in the present instance is misplaced. Continental's rejection of the collective bargaining agreement, unenforceable from the time of the bankruptcy filing, involved no statutory violation.[6] In consequence, we have no such concern to preserve the status quo pending statutory compliance as we had in *Mungin* and *Galveston Wharves.* We noted the distinction between cases involving statutory violations and those involving breach of contract in both *Galveston Wharves* and *Mungin* when we stated: " 'But the employees here do not claim backpay for a breach of contract. Their claim arises out of a violation of the federal statute. The contract-dispute cases therefore are not relevant.' " *Mungin*, 416 F.2d at 1177 (quoting *Galveston Wharves*, 400 F.2d at 327). Similarly, as the claims here involved are for contract rejection damages, our holdings concerning sanctions for statutory violations are not relevant.

Another case relied upon by the appellants, *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60 (2d.Cir.1979), actually supports our ruling here. In *Carpenter*, an employer's unilateral change in wages and benefits prompted its union employees to strike. An Administrative Law Judge found the employer to have committed an unfair labor practice and ordered the strikers be reinstated with back pay. This order was modified by the NLRB to include a back pay award for the strike replacements as well. On appeal, the court in *Carpenter* enforced only that portion of the Board's order which awarded back pay to the reinstated strikers. The appellants assume that the back pay was to run from the beginning of the strike. A reading of the Board's order itself, however, reveals that the award was to consist of "the difference between the wages and other economic benefits which [the workers] *actually received* and the economic benefits which they would have received absent Respondent's unlawful conduct." 238 N.L.R.B. 974, 976 (1978). The Board ruled that the employer's "liability for back pay shall commence as of the date of the employee's unconditional offer to return to work." *Id.* (citing Newport News Shipbilding and Dry Dock Co., 236 N.L.R.B. 1637 (1978)).

### III. *Conclusion*

The September 10 order of the bankruptcy court granting the debtor's motion for partial summary judgment, which disallowed contract rejection damages for time periods the employees were out on strike, is AFFIRMED. The May 8 and June 26 orders of the bankruptcy court granting the debtor's motion for summary judgment, which disallowed all contract rejection damage claims of the appellants, are VACATED and the cause REMANDED for proceedings consistent with this opinion.

GARWOOD, Circuit Judge, dissenting in part.

I join all Judge Gee's cogent opinion save for what is, under the facts of this case, a relatively minor disagreement as to the employee-claimants' entitlement to damages. During the period in which Continental could have continued to operate under its labor contracts, as indicated in part B1 of the majority opinion, I would allow the striking employees to recover amounts not

---

**6.** In *Bildisco*, the Supreme Court ruled that "the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again." 465 U.S. at 532, 104 S.Ct. at 1199. The Court held that an employer did not commit an unfair labor practice by unilaterally imposing new conditions of employment between the time of bankruptcy filing and the time the contract is either affirmed or avoided. *Id.* This holding has been superseded by statute. *See* 11 U.S.C. § 1113. The new statute does not apply, however, to bankruptcy petitions such as this one, filed before July 10, 1984.

exceeding the difference between the rates and benefits actually paid by Continental during that time and those that would have been paid had the provisions of the labor contracts been followed.

I agree that this is not a statutory violation or unfair labor practice act case. I also agree that the strikers were not constructively discharged. Nevertheless, under basic principles of contract law, when Continental clearly repudiated its labor contracts by unilaterally reducing the agreed rates of pay, the employees were no longer required to tender performance.[1] As appropriate work at Continental indisputably continued to be available to the striking employees, the doctrine of avoidable consequences prevents their recovery of what they could have thus earned had they not been on strike. But there is no justification for denying them recovery for the difference between the revised work rule pay rates (and benefits) and those of the labor contracts; to do so simply awards Continental a windfall.

A hypothetical example will illustrate my point. On January 1, A hires B to perform all of A's audit work, for as long during the year as A has need for such, with B's compensation to be at the rate of $5,000 a month. Sometime in June, A informs B that, because A believes good auditors are available at $3,500 a month, B's wages for the final half of the year will be only $3,500 a month. Accordingly, B then accepts, effective July 1, an offer for similar work from C which pays $4,000 a month for the July 1 to December 31 period, and A promptly hires a replacement for B who works throughout the same time for $3,500 a month. I would allow B to recover $6,000 from A. The majority would allow B no recovery. But if B had rejected C's offer and had continued (without waiving his contract rights) to work for A at the reduced $3,500 a month level, the majority would presumably allow B to recover

$9,000 from A, as it allows pre-strike recovery here.[2] That seems an unreasonable result which is not consonant with fundamental contract law.

I accordingly dissent from so much of the majority opinion as disallows all recovery for any striking employee during any of the time he or she was on strike.

---

1. I note that the majority does not hold that the strike was illegal. If it were illegal, that would put the issue in a different context.

2. If, in the latter situation, the majority limited B's recovery to $6,000 (on the theory that he could have mitigated his otherwise $9,000 damages by accepting C's offer), then the majority could not consistently deny B *all* recovery in the former situation (where he accepts C's offer).