**Gilbert ABBINGTON, et al., Plaintiffs,**

v.

**DAYTON MALLEABLE, INC., et al., Defendants.**

Nos. C–2–80–552, C–2–81–713.

United States District Court,
S.D. Ohio, E.D.

March 15, 1983.

Richard O. Wuerth, Bernard Bernard, Columbus, Ohio, Max Brittain, Chicago, Ill., Robert Karl Handelman, I.W. Barkan, Columbus, Ohio, for plaintiffs.

Robert J. Brown, Armistead W. Gilliam, Dayton, Ohio, Donald A. Antrim, Stewart R. Jaffy, Columbus, Ohio, Michael H. Gottesman, Washington, D.C., Carl B. Frankel, Pittsburgh, Pa., for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This matter is before the Court on the motions of defendant Dayton Malleable and defendant United Steelworkers of America for summary judgment pursuant to Fed.R. Civ.P. 56. Plaintiffs[1] filed a five-count complaint in this lawsuit asserting three claims against Dayton Malleable, Inc. (DMI) and asserting the remaining claims against United Steelworkers of America (union). Plaintiffs have brought this lawsuit pursuant to Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, alleging that defendant DMI violated the collective bargaining agreement between the union and DMI when it closed its Columbus foundry. In addition, plaintiffs allege two pendent state claims against DMI. First, plaintiffs allege that defendant DMI made misrepresentations to the plaintiffs and fraudulently induced them to agree to the collective bargaining agreement at issue in this case. Second, plaintiffs allege that defendants DMI and the union "conspired ... to defraud and deceive the plaintiffs."

Plaintiffs' complaint also contains allegations against the union. Plaintiffs initially claim that the union breached its duty of fair representation by, among other things, misrepresenting the facts and circumstances surrounding the execution of the amendments to the collective bargaining agreement; by failing to take action against DMI for closing the Columbus foundry; and by negotiating a plant closing agreement that did not protect the interests of the members of Local 2654. In addition, plaintiffs allege that the union breached its contract with them by failing to protect their interests at all times relevant to this lawsuit. Finally, as has already been noted, plaintiffs allege that defendant union conspired with defendant DMI "to defraud and deceive the plaintiffs."

1. This case was consolidated with *DiPaolo, et al. v. Dayton Malleable, Inc., et al.,* C–2–81–713. In addition, on March 13, 1981, the Court certified a class of all members of United Steelworkers Local 2654 employed at the Dayton Malleable, Inc. plant in Columbus during the period of June 1, 1979 and June 30, 1980. This matter has proceeded as a class action since that date.

## I. *Statement of Facts*

Both defendant DMI and defendant Steelworkers have filed motions for summary judgment claiming that based on the undisputed facts of this case, they are entitled to judgment as a matter of law. Based on the memoranda and supporting documents of the parties, as well as various statements of counsel during oral argument, a statement of the undisputed facts of this case follows.

DMI is in the business of manufacturing rough commercial castings for major equipment manufacturing companies in the United States. The Columbus Division of DMI (the foundry) produced malleable iron primarily for manufacturers of trucks and farm equipment. DMI and the union were parties to a collective bargaining agreement effective from December 26, 1977 until December 26, 1980, which covered the Foundry and DMI's Ironton Division.

During the three-year period ending June 1979, the Foundry lost approximately $13 million. As a result of these financial losses, DMI informed a union representative,[2] as was required by the 1977 collective bargaining agreement, that DMI was planning on closing the Columbus plant. Thereafter, the company postponed the plant closing until March or April of 1979. At that time, a new president of DMI, Mr. Ladehoff, was selected, and another meeting between representatives of the company and union was

held. Once again the financial difficulties of the company were discussed, as well as the declining market for the malleable iron products produced at the Columbus plant.[3] The union's research department confirmed these losses, and it is undisputed that DMI was suffering severe financial trouble during the period of time in question.[4]

A third meeting was held between management and union representatives at which time management made clear that the closing of the Columbus plant was inevitable unless certain changes were made. Among the changes proposed by the company were the following modifications of the collective bargaining agreement:

1. A twelve-month extension, until December 26, 1981, of the existing collective bargaining agreement as it applied to the Columbus plant;

2. A separation of the employees at the Columbus plant from employees at the Ironton plant into two bargaining units under separate agreements;

3. A suspension of cost-of-living adjustments after June 1979 and a wage freeze for the duration of the contract; and

4. Union and management cooperation in devising new production methods and in setting equitable incentive rates.

2. The organizational structure of the United Steelworkers union deserves some elaboration at this point. In order to assist the international in performing its representational function, the international creates local affiliates. A representative of the international is assigned to each local. John T. Green was the international representative assigned to the local in this case. In addition, the international union is divided into geographic regions known as "districts," which are managed by district directors. The district director assigned to cover District 27, which encompasses the City of Columbus, was Harry E. Mayfield. It was Mayfield who was notified of DMI's intention to close the foundry sometime in December of 1978. Union Memorandum in Support of its Motion for Summary Judgment at 3–4.

3. It appeared to the management of DMI at this time that many of their customers were moving towards use of lighter, nodular iron compo-

nents. Management, therefore, concluded that in order to maintain their market, changes in production and equipment would be required if the Columbus plant were to be made profitable. Company Memorandum in Support of its Motion for Summary Judgment at 3–4.

4. The DiPaolo plaintiffs state that the union did not confirm these losses. They produce no evidence to support this contention. *See* DiPaolo Plaintiffs' Memorandum in Opposition to Union's Motion for Summary Judgment at 3. The union, however, offers supporting evidence which confirms that independent research was conducted by the union concerning DMI's claimed financial losses. See Union's Memorandum in Support of Motion for Summary Judgment and supporting affidavits and Union's Reply Memorandum in Support of its Motion for Summary Judgment at 9.

The management of DMI informed the union that if these concessions were made, DMI would make every effort to keep the Columbus plant open including making efforts to modernize the Foundry.[5] The union believed that prior to making any decision on these matters, the employees were entitled to be consulted.[6]

Therefore, management and union representatives agreed to hold two meetings in a tent to be erected on a lot next to the plant. At the June 8, 1979 tent meeting, employees were informed by DMI officials of the company's financial plight.[7] At that time, Mr. Ladehoff, DMI's president, informed employees that DMI had only two options— closing the plant or attempting to convert and modernize the plant. Ladehoff went on to explain that the later option would have to be approved by the board of directors. Thereafter, Ladehoff outlined the proposed modifications to the collective bargaining agreement which he considered "critical to convince our Board of Directors

to allow us to invest 8 to 10 million new dollars into this plant."

At this tent meeting, a union representative also spoke to the employees. The proposed modifications to the collective bargaining agreement were reviewed and the union representative recommended that the concessions be approved. Thereafter, a question and answer session was held, and management gave employees an opportunity to consult with their union representatives privately.

The following day, Saturday, June 9, 1979, a secret ballot vote was conducted. Approximately 90% of the local union's membership turned out to vote. DMI's proposed modifications of the collective bargaining agreement were approved by a vote of 426 to 19. Thereafter, company and union officials met in an attempt to reduce these approved modifications to writing. After a series of meetings, the parties' differences were resolved and the modifications were formalized in a written memorandum of agreement.[8] That memorandum

5. Specifically, representatives of management stated that attempts would be made to get DMI's Board of Directors to approve an $8–$10 million conversion of the Foundry to the production of nodular iron. See Exhibit 1 attached hereto.

6. The Steelworkers note in their Memorandum in Support of their Motion for Summary Judgment that they were not legally bound to seek membership approval of the revised collective bargaining agreement. See Union's Motion for Summary Judgment at 36 and case law cited therein. Nonetheless, the union did seek such approval following the tent meeting on June 8, 1979.

7. The remarks of Mr. Ladehoff, as well as others, at this tent meeting were recorded and subsequently transcribed. A copy of the transcript is attached to DMI's motion for summary judgment. Defendants do not take issue with the accuracy of this transcript. A copy of Mr. Ladehoff's statements at the tent meeting are attached hereto as Exhibit 1.

8. The Memorandum of Agreement stated:

This Memorandum of Agreement is between Dayton Malleable, Inc. and the United Steelworkers of America, AFL–CIO–CLC, which represents the employees at the Columbus, Ohio plant.

As a result of the vote by bargaining unit employees on June 9, 1979, the labor agreement dated December 26, 1977 shall be permanently changed as follows:

A. The labor agreement dated December 26, 1977 entitled Basic Agreement, Ohio Malleable Appendix, Pension Agreement and Supplemental Unemployment Benefit Agreement shall be only between Dayton Malleable, Inc., and the United Steelworkers of America, AFL–CIO–CLC. All references to Local # 3664 shall be stricken from that labor agreement. All existing provisions granted to Local # 2654 shall remain in full and complete effect, except as noted in this Memorandum of Agreement. There shall be two (2) separate and distinct labor agreements; one for the Columbus plant and one for the Ironton plant.

B. The Agreement between Dayton Malleable, Inc., and United Steelworkers of America, AFL–CIO–CLC, Columbus Division employees, shall be extended for one year. The termination date shall now be midnight December 26, 1981 instead of midnight December 26, 1980.

C. Dayton Malleable, Inc., and United Steelworkers of America AFL–CIO–CLC, Columbus Division employees, agree that the cost-of-living 'add on' in effect as of July 1, 1979 shall remain at that level, without further increase, through the life of this agreement.

E. Dayton Malleable, Inc., and United Steelworkers of America, AFL–CIO–CLC, Columbus Division employees, mutually agree to

of agreement expressly embodied the modifications to the collective bargaining agreement which had been approved the day following the tent meeting.[9]

Despite the poor performance of the Foundry in July 1979, in August 1979 DMI's Board of Directors voted an initial investment of $5 million to buy new equipment needed for the conversion to nodular iron production. Various press releases and letters from management confirmed the Board's approval of this initial expenditure for plant modernization.[10]

In the fall of 1979, the financial condition of DMI continued to deteriorate. Nonetheless, it appears from the evidence that attempts to save the Columbus Foundry were still being made. In October of 1979 new equipment necessary for the conversion was purchased and installed. During this time discussion between company and union representatives concerning the effects of modernization were ongoing.[11]

By December of 1979 financial losses to DMI were so great that the company was forced to shut down for a period of time and lay off many employees. In January 1980 and February 1980 the company continued to experience severe financial problems. In addition, the company could foresee little relief in the future since marketing forecasts suggested a continued decrease in demand for both malleable and nodular iron.

Finally, the Board of Directors of DMI concluded that the Columbus Foundry should be closed. On March 13, 1980, DMI representatives notified union officials that the Board of Directors had recommended that the Columbus Foundry be closed permanently.[12] On March 20, 1980, the Board of DMI voted to shut down the Columbus plant as of May 31, 1980. The following day, the Foundry's general manager sent a

---

cooperate in devising new production methods, specifically in setting new timing and standards to arrive at equitable incentive rates. Any disputes arising which concern this section shall be processed in accordance with the labor agreement, specifically that section entitled Grievances, pages 0–14 and 0–18.

F. The parties shall meet and establish a job evaluation system; said system shall be CWS, which is used by the United Steelworkers of America. An agreement to this effect shall be an Addendum to this Memorandum.

**9.** Plaintiffs attempt to make much of the fact that although the modifications were approved in June 1979, no writing memorializing the parties' understanding was executed until October 1979. The Court does not find this fact significant. As the union points out in its motion for summary judgment, the delay was due to a series of negotiations between the union and company concerning the precise content of the memorandum of agreement. Union Memorandum in Support of Motion for Summary Judgment at 9–10.

The Court also notes at this point that plaintiffs attempt to make much of the fact that no advance warning of the tent meetings was given to employees. Once again, the Court does not believe this fact is of great import. The employees were notified of the tent meetings a week before their occurrence. Furthermore, specific information concerning the purpose of the meeting and the proposed modification of the collective bargaining agreement was withheld in order to avoid the spread of rumors. Id. at 9–10, 37.

**10.** Plaintiffs attach various press releases and letters from management to their memoranda in opposition to defendant DMI's motion for summary judgment. In the summer and fall of 1979, these letters consisted largely of expressions of management's commitment to modernization, including statements concerning the Board's approval of the $5 million expenditure and the purchase of new equipment. See Abbington Plaintiffs' Memorandum in Opposition to Company's Motion for Summary Judgment, Exhibits 3 and 4.

**11.** Specifically, the union, in its Memorandum in Support of Summary Judgment, notes that continuing efforts were made to develop new incentive plans to meet the contingencies of the new equipment and insure against loss of earnings. The union even went so far as to initiate grievances concerning the reduction of incentive pay resulting from the installation of the new machinery. Union's Memorandum in Support of Motion for Summary Judgment at 15–17.

**12.** At that time, the union officials inquired as to whether anything could be done to prevent the plant's closing. They were informed that nothing could be done and that losses had simply been too great.

letter to each employee notifying him or her of the decision to close the Foundry.[13]

Thereafter in April 1980, the union and DMI met to negotiate a plant closing agreement. The plant closing agreement provided for severance pay in amounts equal to vacation entitlements and guaranteed payment of pension benefit levels provided for in the pension agreement. Thereafter, the union met with employees on several occasions to explain the terms of the plant closing agreement.[14]

Thereafter in June 1980, plaintiffs commenced this action against DMI and the union. Both DMI and the union have filed motions for summary judgment. The Court will address the motions of each defendant separately.

## II. *Motion of Defendant DMI for Summary Judgment*

### A. *Breach of the Collective Bargaining Agreement*

Plaintiffs' first claim under Section 301 of the Labor Management Relations Act is that DMI "breached the amended collective bargaining agreement by shutting the Columbus Plant before December 26, 1981."

It is clear, however, that neither the collective bargaining agreement dated December 26, 1977, nor the Memorandum of Agreement required DMI to keep the Columbus Foundry open.[15] The seminal case in this area is the Sixth Circuit's decision in

*Fraser v. Magic Chef-Food Giant Markets, Inc.,* 324 F.2d 853 (1963). The facts of the *Magic Chef* case parallel the facts of this case very closely. In *Magic Chef* the company and union entered into a new collective bargaining agreement when the company experienced financial difficulties. This new agreement superceded the old agreement. Prior to the expiration of the new agreement, the company closed its plant. The employees sued claiming the company had an obligation to continue operations for the duration of the new collective bargaining agreement. The Sixth Circuit rejected plaintiffs' claims noting that an employer has the right to cease operations even when business is discontinued during the life of a collective bargaining agreement. *Magic Chef,* 324 F.2d at 855–6. *See also Wimberly v. Clark Controller Co.,* 364 F.2d 225, 228 (6th Cir.1966); *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1122 (6th Cir.1981).[16]

Furthermore, the Court in *Magic Chef* concluded that no provision in the agreement could be interpreted as a limitation on the right of the company to discontinue business and that the contract could not be enlarged by oral testimony. *Id.* at 856–7.

Similarly, on the facts of this case, DMI had no obligation to continue operations at the Columbus Foundry for the duration of the Memorandum of Agreement.

---

**13.** The letter to each employee contained a detailed accounting of the reasons for closing of the plant and the problems experienced by the company in the months following the modification of the collective bargaining agreement. A copy of this letter is attached as Exhibit 7 to Abbington Plaintiffs' Memorandum in Opposition to Company's Motion for Summary Judgment.

**14.** It should be noted that from the date of the announced closing, pursuant to standard procedure, the international imposed an administratorship over the local. This action was also in accordance with Article IX of the United Steelworkers International Constitution. In imposing an administratorship, the international attempted to insure the orderly administration of the collective bargaining agreement. Union's Memorandum in Support of Motion for Summary Judgment at 24–25.

**15.** As a matter of fact, the collective bargaining agreement, extended by the memorandum of agreement, implicitly recognizes the company's right to close down the plant. Article XIV states:

> If the Company decides to permanently shut down a plant, it will notify the Union of its decision thirty (30) days or more before effecting the shutdown. The Company and the Union will then meet to discuss severance pay.

**16.** This rule is not limited to the Sixth Circuit. *See e.g., Union de Trabajadores v. Helio,* 434 F.Supp. 643, 646 (P.R.1977); *Hotel and Restaurant Employees v. Allegheny Hotel Co.,* 374 F.Supp. 1259, 1261 (W.D.Pa.1974); *Bakery and Confectionary Workers v. Great A & P Tea Company,* 357 F.Supp. 1322, 1323 (W.D.Pa. 1973), *aff'd without opinion,* 491 F.2d 748 (3d Cir.1974).

The Memorandum of Agreement in this case contained no provision obligating the company to remain in business for the duration of that agreement. Finally, contrary to plaintiff's assertions, oral representations or promises cannot be relied on to alter the clear, unambiguous terms of the memorandum of agreement.[17] Therefore, neither the collective bargaining agreement dated December 26, 1977, nor the memorandum of agreement were breached by DMI when it closed the Columbus plant in May 1980.[18]

### B. *Promissory Estoppel*

In addition to alleging breach of the alleged memorandum of agreement, plaintiffs allege a cause of action for breach of contract based on the doctrine of promissory estoppel. Relying largely on the Sixth Circuit's decision in *Local 1330, United Steelworkers of America v. United States Steel Corporation,* 631 F.2d 1264 (6th Cir.1980), plaintiffs claim that contractual promises to modernize the Columbus Foundry, and not to close the Foundry may be found based upon the equitable doctrine of promissory estoppel.

The Sixth Circuit in *United Steelworkers* specifically recognized the possibility of a cause of action based on the equitable doctrine of promissory estoppel. In that case, the Court stated that

> The doctrine of promissory estoppel recognizes the possibility of the formation of a contract by action or forbearance on the part of a second party, based upon a promise made by the first party under circumstances where the actions or forebearance of the second party should reasonably have been expected to produce the detrimental results to the second party which they did produce. Restatement (Second) of Contracts § 90 (1932) states:

> > A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does not induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

> Restatement (Second) Contracts § 90 (1932).

In this case, plaintiffs' contractual claim of promissory estoppel is based upon oral statements made during the tent meeting concerning efforts to modernize and keep the Foundry open and the employee responses to these representations.

■ At the outset, there are a number of difficulties with plaintiffs' promissory estoppel argument. It is by no means clear that a claim of promissory estoppel based on oral representations is cognizable when the parties have executed a formal contract which addresses the precise matters which are the subject of those oral representations.[19] This matter is raised only in pass-

---

17. Plaintiffs would have this Court consider alleged oral representations made during the tent meeting as part of the contract between the parties. In essence, plaintiffs urge that the entire agreement between the parties is not embodied in the memorandum of agreement, but rather consists of prior statements made to employees. This is a classic case of an attempt to use parol evidence to alter the terms of a written contract. As such, this Court can discern no reason for allowing these oral statements to be included as part of the terms of the parties' agreement. *See Magic Chef,* 324 F.2d at 857; *Santilli v. General Motors Corp.,* 100 LRRM 2326, 2328 (N.D.Ohio 1978); *Rothlein v. Armour & Co.,* 377 F.Supp. 506 (W.D.Pa.1974). This Court further notes that the agreement between the parties specifically noted that parol evidence was inadmissible to alter the terms of the parties' agreements. Article XV of the agreement stated:

> Complete Agreement..... The parties agree that *no* alleged past practice, understanding or oral agreement of any nature ... shall be recognized as a precedent or have any binding effect on either party.

18. Plaintiffs' first claim also alleges that DMI "breached the amended collective bargaining agreement by failing to make good faith effort to modernize the Columbus plant." However, just as the amended agreement contained no requirement that DMI keep the Foundry open for the duration of the agreement, it likewise contained no requirement that DMI modernize.

19. Once again, the parol evidence rule would seem to preclude any contractual claim based on oral representations when the parties have executed a formal contract which addresses the precise matters which are the subject of those oral representations. *See Steelworkers, Local*

ing, however, since even if this Court assumes that a claim of promissory estoppel based on oral representations is cognizable, it is clear that no such claim has been established on the undisputed facts of this case.

The doctrine of promissory estoppel requires that plaintiffs prove that defendant DMI made a promise which could reasonably be expected to induce action or forebearance. This Court's review of the undisputed facts in this case leads it to the inevitable conclusion that no statements by any officers of DMI at either the tent meetings or in various press releases constituted a definite promise to continue operation of or to modernize the Foundry.

The statements of DMI officials at the June 8 "tent meeting" cannot be read as promises. At that meeting the company president first reviewed the financial difficulties experienced by DMI. Mr. Ladehoff then stated:

Now that brings us to the first of several decisions that we must make as a company.

One choice we have is to simply stop losing money here and close it down. The second choice for Dayton Malleable is to invest somewhere between $8–10 million to convert this plant to produce primarily nodular iron.

Mr. Ladehoff then proceeded to address himself to each of the options available to DMI. He stated:

As for the first of those two choices, closing the foundry—it's an option that I, and I know that you, would like to avoid. I do not want to close this plant, but by the same token I cannot continue with an

operation that loses millions of dollars each year....

. . . . .

That brings us to the second choice—to convert this plant to nodular iron production.

Thereafter, Mr. Ladehoff stated that prior to converting and modernizing the plant, the company would have to obtain the approval of the board of directors. It was further explained that in order to obtain approval of the conversion plan, the employees would have to convince the Board of Directors that they were willing to make certain concessions. The employees were then presented with the four contract modifications, which eventually became the subject of the memorandum of agreement. Mr. Ladehoff concluded his speech noting that

It's not going to be easy for us either, but I'm confident that with the 4 points that I've outlined *we have at least a chance* to make this plant successful once again.

. . . . .

Now the choice is yours—if you vote to support us, *we're going to do our best* to turn this plant into a winner so everybody here can win.

The Court is simply not convinced that any of these statements constitute *promises* which would reasonably be expected to induce action or forebearance.

Furthermore, none of the press releases issued by the company during the summer and fall of 1979 constitute a promise to continue operation of the plant.[20] Having reviewed these press releases the Court concludes that the statements contained therein can be divided into two categories.

*1617 v. GF Business Equipment,* 105 LRRM 2762, 2764–65 (N.D.Ohio 1978), *aff'd without opinion,* 620 F.2d 303 (6th Cir.1980).

**20.** Plaintiffs also attempt to state a promissory estoppel claim based on alleged oral representation by DMI officers, that they would keep employees informed of the Foundry's progress. This contention is simply without merit. First, it is clear that DMI had no contractual duty to disclose its progress under the memorandum of agreement. Furthermore, alleged oral representations on this subject are not admissible

under the parol evidence rule. Finally, even assuming that the Court could consider alleged oral representation, the evidence demonstrates that no promise to keep the employees informed of any progress was ever made. Even further assuming the existence of such a promise, the evidence discloses that the company made good faith attempts to keep the employees informed. See Exhibits 3 and 4 of Abbington Plaintiffs' Memorandum in Opposition to Company's Motion for Summary Judgment.

First, certain press releases simply recite factual information concerning the Foundry—*i.e.,* the board's approval of the $5 million investment to convert the plant to nodular iron production; the decision to purchase new equipment; and production goals. The remaining statements in press releases may basically be characterized as "congratulatory" insofar as they comment favorably on employee enthusiasm for and dedication to efforts to keep the plant operational. None of the statements in these press releases may be deemed a promise under the standard enunciated in Restatement (Second) of Contracts § 90.[21]

In conclusion, therefore, the Court believes that plaintiffs' allegations of a right to recovery based upon the doctrine of promissory estoppel are without merit.

### C. Pendent State Claims

■ Plaintiffs' remaining allegations against defendant DMI are state claims. First plaintiffs allege a cause of action based on the tort of misrepresentation and second, plaintiffs allege "a conspiracy . . . to defraud and deceive [them]." Both these claims are based on state law. Because this Court has granted defendant summary judgment on the only claims of plaintiffs for which there was federal jurisdiction, these pendent state claims must be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Aldinger v. Howard,* 427 U.S. 1, 14, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976); *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 370, 98 S.Ct. 2396, 2400, 57 L.Ed.2d 274 (1978).

These pendent claims will be dismissed without a finding on the merits for the reason that a federal jurisdictional base no longer exists.

### III. Motion of Defendant United Steelworkers for Summary Judgment

Also before the Court is defendant union's motion for summary judgment. Plaintiffs' complaint contains a number of allegations against the union. First, plaintiffs claim that the union breached its contract with them by failing to protect their interests at all times relevant to this lawsuit and plaintiffs further claim that the union breached its duty of fair representation.

More specifically, plaintiffs allege that the union "knew . . . that Dayton Malleable had no plan to modernize the Columbus plant" and "failed to advise . . . plaintiff that the representations of [DMI] that it intended to modernize the Columbus plant" were false. Plaintiffs further allege that the union breached its duty to them "by recommending approval of the modifications of the collective bargaining agreement" and by "failing to advise the plaintiff [of] the consequences of adopting the modifications." Finally, plaintiffs contend that the union acted arbitrarily in "failing to take action against Dayton Malleable" following the plant closing and by negotiating a plant closing agreement that did not protect their interests. Plaintiffs' memoranda contra the union's motion for summary judgment contain a number of additional allegations against the union, each of which will be addressed below.

The Court begins its analysis by noting that the plaintiffs have presented no facts which would support their allegation that the union breached its contract with them. They have not directed the Court's attention to any specific provisions of any contract between the union and the plaintiffs, nor have they explained the ways in which the union's conduct constituted a breach of such a contract, if such a contract exists. Therefore, the Court concludes that this

---

**21.** The Court notes in passing that in addition to being unable to find a promise, the Court finds insufficient evidence on the record concerning detrimental reliance. Arguably the Court can assume that a number of the employees of DMI, assuming that the plant would remain in operation, gave up opportunities to seek other jobs. Therefore, arguably plaintiffs could present a factual dispute concerning plaintiffs' reliance on alleged promises. Having concluded that no such promise existed, however, the Court need not reach the question of reliance.

allegation of breach of contract is coextensive with and a mere restatement of plaintiffs' breach of the duty of fair representation claim.

Furthermore, at this point it is worth noting that under the seminal case in this area, *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), proof that a grievance is meritorious does not alone establish a breach of the duty of fair representation. In this same vein, it seems axiomatic that the union's liability for breach of the duty is predicated on the finding of liability against the company. *Vaca,* 386 U.S. at 195, 87 S.Ct. at 919; *Ruzicka v. General Motors Corp.,* 649 F.2d 1207 (6th Cir.1981). Nonetheless, there are exceptions to this rule, as for example, when the union's breach of duty so taints the entire grievance process that the company's assertion that the decision of the arbitrator is final cannot be accepted. *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Therefore, while this Court's dismissal of the claims against the employer would ordinarily be dispositive of the plaintiffs' claims against the union, prudence dictates that we address the claims against the union separately at this point in time.

■ In an effort to independently determine the union's potential liability, it is necessary to briefly restate the law concerning a union's duty of fair representation.[22] It is now well established that a breach of the duty of fair representation "occurs only when a union's conduct is arbitrary, discriminatory or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Furthermore, the mere fact that there are alterna-

tive courses of action available to the union which may have better advanced the interest of the union's membership does not alone establish a breach of the duty. Indeed, even proven "errors in judgment ... if ... made honestly and in good faith" would not violate the union's duty. *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1103 (6th Cir.1981). In this regard, a number of courts have noted that "a wide range of reasonableness must be allowed the statutory bargaining agent," *Ford Motor Co. v. Hoffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), and courts should be hesitant to engage in the "process of second guessing" the union's decisions. *Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1212 (6th Cir.1981). While it is true that this "wide range of reasonableness" is not without limits, *Hines v. Anchor Motor Freight,* 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976), it is also true that allegations of this breach of duty must contain more than mere "conclusory allegations." *Hubicki v. ACF Industries, Inc.,* 484 F.2d 519 (3d Cir.1973). The plaintiffs must provide some documentation of their claim that the union acted arbitrarily, discriminatorily or in bad faith.

With this statement of the law of the duty of fair representation in mind, the Court will now analyze the union's motion for summary judgment. The plaintiffs by and large do not dispute the evidence offered by the union detailing the action it took during all times relevant to this litigation.[23] Plaintiffs do, however, offer criticism of these actions and suggest alternative courses of action in an effort to establish a breach of the duty of fair representation. The only issue for this Court to de-

---

**22.** The plaintiffs allege that summary judgment is always inappropriate in duty of fair representation cases because such cases inevitably involve questions of good faith which do not lend themselves to resolution on motions for summary judgment. While the Court acknowledges that plaintiffs' concern in this regard may be valid in certain cases, the fact remains that summary judgment is appropriate in duty of fair representation cases, as in all cases, where there is no dispute as to any material issue of fact. *See Bryant v. United Mine Work-*

*ers,* 467 F.2d 1 (6th Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1370, 35 L.Ed.2d 592 (1973).

**23.** Admittedly there are some factual disputes among the parties in this litigation. Those disputes have been duly noted by the Court and will be discussed at various times herein. However, these disputes are simply not material to any of the legal issues in this case so as to preclude this Court from granting the union's motion for summary judgment.

cide, therefore, is whether under the facts presented the union breached its duty to the plaintiffs. The Court will proceed to detail chronologically the criticism of the union's actions offered by the plaintiffs and then undertake to analyze the union's actions pursuant to the legal standard already set forth.

### A. Breach of Duty During Period Preceding Tent Meetings

█ Initially, in the period of time preceding the ratification of the contract modifications, plaintiffs allege that the union breached its duty to them in the following ways: (1) the union met secretly with management between December 1978, when the company first considered closing the plant, and April 1979 when the tent meetings were held; (2) after learning in December 1978 of the possibility of the plant closing, the union failed to advise the employees of that possibility; and (3) the union failed to renegotiate the collective bargaining agreement or to "take action" regarding pension or severance rights in December 1978.

Considering plaintiffs' allegations either singularly or collectively, they simply do not establish arbitrary, discriminatory or bad faith conduct. The evidence shows that in December 1978 representatives of DMI notified the union district director, Mayfield, that DMI intended to shut down the plant immediately. The union objected to the company's plan and persuaded DMI to reconsider taking any action at least until after Christmas. Union Memorandum in Support of Motion for Summary Judgment at 5–6 and supporting affidavits. DMI at this point chose not to close the plant, and the union was not contacted again until April 1979 when DMI's new president, Mr. Ladehoff, asked to meet with union representatives.

Plaintiffs' criticisms of the union's conduct during this period are simply insufficient to establish a breach of the duty of fair representation. The Court frankly is at a loss to understand why the union was required to pursue the problem of the plant closing at any time, from December 1978 until April 1979, or how the failure to pursue the problem constitutes arbitrary, discriminatory or bad faith conduct. It is undisputed that during this time the plant remained open and DMI was under a continuing obligation to notify the union of any change with regard to the plant. At that point in time, the union's failure to pursue the subject of the plant closing seems entirely reasonable. In fact, it is patently unreasonable to suggest that the union should have attempted to negotiate a new collective bargaining agreement or secure pension or severance right at that time. Moreover, the union's decision not to reveal the information concerning the possibility of a plant closing was not arbitrary. At that point no final decision concerning the plant closing had been made and the union's belief that any communication from them at that point would have needlessly worried the employees seems well-founded. In sum, no interpretation of the facts concerning the union's conduct between December 1978 and April 1979 supports plaintiffs' allegations of arbitrary, discriminatory or bad faith conduct.

### B. Breach of Duty Immediately Prior To And At The Tent Meetings

In the period of time immediately preceding the tent meeting, plaintiffs allege the union acted arbitrarily in failing to give them adequate notice of these meetings and in failing to verify company statements concerning losses. The plaintiffs further allege that the conduct of the union during the tent meetings themselves constitutes a breach of the duty of fair representation. Once again plaintiffs' allegations in this regard are not meritorious.

The facts of this case clearly establish that in April 1978 the union was contacted by Mr. Ladehoff, DMI's new president, who presented the union with evidence that the Columbus plant was losing large sums of money. The union's district director had the union's research department confirm

these losses.[24] The union then undertook to negotiate a set of contract concessions that would hopefully forestall the closing of the Columbus plant.[25] Prior to agreeing to those concessions sought by the company, however, the union concluded that the seriousness of the situation warranted the presentation of these concessions to the employees for ratification. The union and the company therefore agreed to hold a tent meeting on June 8 to explain the proposed contract modifications to the employees. The plaintiffs were given notice of the tent meetings and ratification vote a week in advance of the meeting and vote.[26] The notice did not contain the proposed contract modifications. The union explains this omission by stating that it was the union's judgment that the proposals should be kept confidential, to prevent rumors and hysteria from spreading, until the company and un-

ion had the opportunity to fully explain these proposals at the tent meeting.

The evidence further establishes that the tent meeting was indeed held on June 8. The plaintiffs allege that the union contributed to the emotionally charged atmosphere of the tent meeting[27] and failed to adequately advise the employees of the consequences of ratifying the proposed contract modifications. The evidence, however, fails to establish that the union acted arbitrarily or in bad faith. The employees were all given adequate notice of the tent. meeting and every effort was made to ensure employee attendance at that meeting.[28] The discussions at the meeting by both management and the union, while somewhat emotional given the seriousness of the subject under discussion, were nonetheless factually accurate.[29] The meeting itself apparently

24. As has already been noted, the plaintiffs allege that the union did not confirm these losses. This arguably presents a factual dispute. However, the plaintiffs present the Court with no evidence to support this allegation. Absent some documentation to support this claim, this conclusory allegation cannot serve to prevent the granting of summary judgment. Furthermore, no one disputes the fact that DMI was actually losing large sums of money. *See* Footnote 4, *supra*.

25. The union thoroughly sets forth the scenario leading up to agreement between the union and company four contract concessions. For example, the company initially proposed sharp reductions in wages and benefits which the union opposed. *See* Union's Memorandum in Support of Motion for Summary Judgment at 509 and supporting affidavits; Union's Reply Memorandum in Support of Motion for Summary Judgment at 9. Thereafter the parties engaged in a series of negotiations which culminated in agreement on the four proposed modifications previously set forth. There is evidentiary support, therefore, for the union's contention that the four contract modifications agreed upon were less onerous than those concessions originally requested by the company.

26. The plaintiff initially argued that they were only given 24 hours' notice in advance of this meeting. This allegation proved to be untrue. All the parties now agree that DMI employees were given a week's notice in advance of the tent meeting.

27. The plaintiffs specifically criticize the union for securing the presence at the meeting of political leaders, specifically Mayor Moody and

Councilman Hammond, whose presence contributed to the "air of urgency." The Court cannot discern any reason for concluding that the union's conduct in this regard was arbitrary.

28. At the union's request, the company agreed to pay the employees for time spent in attending the tent meeting. The letters notifying the employees of the tent meeting stated in no uncertain terms that serious matters would be discussed at that meeting. The letter began by noting the existence of "[f]requent rumors" as to "whether or not the plant would continue to operate" and spoke of the need to take steps "that may prevent us from becoming another Federal Glass or Columbus Malleable,"—two plants that had been forced to close. The letter, which was signed by President Ladehoff, specified the date of the tent meeting and noted that:

At that time I will present to you a plan that could enable this division to continue operation. Your acceptance of the points of this plan will enable the Board of Directors of DMI to consider modernization of the plant and continued operations. If the program is not accepted, the future outlook for the plant is very poor.

Union Memorandum in Support of Motion for Summary Judgment at 10 and supporting affidavits.

29. The plaintiffs do not direct the Court's attention to any statements made by the union at the tent meeting which constitute misrepresentations. Plaintiffs assert in a conclusory fashion that "the impression left by the tent meet-

was calm and well organized and all employees were given the opportunity to have any of their questions answered. Based upon these undisputed facts, the Court can discern no basis for concluding that the union breached its duty to the plaintiffs immediately prior to or at the tent meetings.

### C. Breach of Duty Immediately Prior To Or During the Vote

In the period of time following the tent meetings, but prior to the voting, the plaintiffs claim the defendant union breached its duty to them by failing to prepare a written statement of the contract modifications to be voted on; by failing to give plaintiffs adequate time to consider the proposed concessions; and by misrepresenting the fact that the proposal to sever the Local in Columbus from the Local in Ironton had already been voted on by the Ironton workers. Plaintiffs further claim that the ratification vote procedures employed by the union "deprived them of the meaningful exercise of their right to ratify." Specifically, plaintiffs contend that ballots were of the "yes/no" variety and did not contain any written description of the proposed contract modifications.

Before addressing plaintiffs' allegations with regard to the union's conduct immedi-

ately before and during the ratification vote, the Court notes that there is some question as to whether the duty of fair representation has any application to voting procedures, as well as the standard to be applied in such cases. A number of courts have held that the duty of fair representation does not require submission of collective bargaining agreements to ratification by membership. *See American Postal Workers Local 6885 v. American Postal Workers Union,* 665 F.2d 1096, 1105 n. 20 (D.C.Cir.1981); *Confederate Independent Unions v. Rockwell-Standard Co.,* 465 F.2d 1137 (3d Cir.1972); *Cleveland Orchestra Committee v. Cleveland Federation of Musicians Local 4,* 303 F.2d 229, 233 (6th Cir. 1962), *Aikens v. Abel,* 373 F.Supp. 425, 432 (W.D.Pa.1974).[30]

Assuming the duty of fair representation is not violated when the union provides no vote at all, it remains to be decided under what circumstances, if any, the duty is offended when the union chooses to submit proposals to the membership for ratification.[31]

■ At the very least, the Court believes that when the union undertakes the task of obtaining membership ratification of proposed contract modifications, even though it has no duty to do so, the procedures employed to obtain such ratification must not

ing" was that the company and union were going to undertake a plan to modernize and keep open the plant. These bare allegations, absent some documentary support, do not persuade the Court that the union breached its duty of fair representation. *See discussion* concerning company statements at tent meeting, *supra.* The Court also notes that the Abbington plaintiffs have attached to their memorandum in opposition a copy of District Director Mayfield's statements at the tent meeting on June 8. Though the transcript of Mayfield's statement is incomplete and somewhat difficult to understand at various points, the Court nonetheless can discern no statements which misrepresent the facts and circumstances as they existed at the time of that meeting.

**30.** In this case the Court can discern, and plaintiffs submit no evidence that there was a contractual duty to submit the modifications to the membership for a vote. Assuming such a contractual duty existed, the same standard for determining whether the union breached its

duty of fair representation applies in determining whether the union breached any contractual duty owed the plaintiffs.

**31.** The union cites additional case law which holds in effect that the duty of fair representation cannot be used to regulate the internal affairs of the union, including ratification votes. *See Lear Siegler, Inc. v. United Auto Workers,* 419 F.2d 534, 535 (6th Cir.1969); *accord Houchens Market of Elizabethtown, Inc. v. NLRB,* 375 F.2d 208, 212 (6th Cir.1967). To the extent that the internal decision-making process of unions is regulated by other federal statutes, *i.e., Labor-Management Reporting and Disclosure Act of 1959,* 29 U.S.C. § 401 *et seq.* [Landrum-Griffin Act], the union has made a valid point. Nonetheless, on the unique facts of this case, the Court is not prepared to conclude that the union had no duty to conduct this ratification vote in a nonarbitrary, nondiscriminatory manner.

be arbitrary, discriminatory, or in bad faith. *See Parker v. Teamsters Local 413,* 501 F.Supp. 440 (S.D.Ohio 1980) aff'd. mem. 657 F.2d 269 (6th Cir.1981).[32] Having concluded that the duty of fair representation applies to the procedures employed by a union when obtaining membership ratification of contract modification, it is now necessary to examine the plaintiffs' criticisms of the ratification vote in this case.

The Court cannot conclude that the procedures employed in obtaining ratification of contract modifications were arbitrary, discriminatory or in bad faith. In this case, the union membership was given 24 hours to consider the proposed modifications prior to voting. In addition, while the modifications were not written down prior to the vote, these modifications were explained a number of times at the tent meeting by representatives of both the union and the company. The employees were given ample opportunity to have any questions they might have concerning the proposals answered. There were no improprieties surrounding the casting of ballots and no one objected to the voting procedures at that time. Over 90% of those employees turned out to vote on the contract modifications. While the ballots were of the yes or no variety, the vote was not a close one—426 employees voted in favor of the modifications while only 19 voted against DMI's proposal.[33] The Court can simply discern no facts from which it could conclude that the ratification vote procedures employed by the union were arbitrary, discriminatory, or in bad faith.[34]

### D. *Breach of Duty Following the Ratification Vote*

In the period following the ratification of the proposed modifications, the plaintiffs allege the union breached its duty of fair representation in the following ways: (1) by failing to immediately reduce the agreed to modifications to writing; (2) by failing

---

**32.** Whether ratification procedures are so arbitrary as to deprive voters of a meaningful opportunity to exercise their right to ratify is a question which depends on the facts and circumstances of each case. *Parker v. Teamsters Local 413,* 501 F.Supp. at 449.

**33.** In this regard, the facts of this case are clearly distinguishable from the facts of *Parker v. Teamsters Local 413, supra,* where the entire procedure surrounding the vote was so inadequate and arbitrary as to "deprive employees of the meaningful exercise of their contractual right to ratify." *Id.* at 449. In *Parker,* the employees were given an hour's notice of the vote; were misled to believe that no vote would be taken for several weeks; and were not permitted to discuss the proposals. In addition, the election in *Parker* was decided by only one vote and the number of ballots cast exceeded the number of names on the voter sign-up sheet. These facts coupled with the fact that the ballots were of the yes/no variety led the court in *Parker* to conclude that the procedures employed were arbitrary and unreasonable. Therefore, *Parker* is clearly distinguishable from the facts of the case at hand.

**34.** It should be noted at this point that the Court's conclusion is not altered by plaintiffs' allegation that the union misrepresented the facts concerning one of the proposed contract modifications. Specifically, Mayfield allegedly stated some time following the tent meeting that the Ironton workers had already voted to sever the local in Ironton from the local in Columbus. The union denies this allegation. This factual dispute, however, does not alter the Court's conclusion that the union did not act in bad faith or arbitrarily. Even assuming such a statement were made, the facts surrounding the making of that statement, viewed in the totality of circumstances, were such that the statements could not have affected the outcome of the election or resulted in any injury to plaintiffs. *See Humphrey v. Moore,* 375 U.S. 335, 354, 84 S.Ct. 363, 374, 11 L.Ed.2d 370 (1964); *Brown v. United Auto Workers,* 689 F.2d 69, 71 (6th Cir.1982); *Anderson v. United Paperworkers International Union,* 641 F.2d 574, 578–80 (8th Cir.1981). First, it is clear that if such a statement were made, it was made after the tent meeting in a private conversation with one employee. This alleged statement may have been overheard by a few other employees. Second, the statement involved only one of the proposed modifications to the contract in an election on four proposed concessions which were clearly needed to avoid the shutting down of the Columbus foundry. Therefore, Mayfield's alleged statement with regard to this one contract modification would hardly seem to have been determinative as to how employees would vote. Even assuming, however, that this statement was determinative for the handful of employees who overheard it, given the overwhelming vote in favor of the proposed modifications, those handful of votes would not have altered the outcome of the election.

to monitor the company's progress concerning modernization; (3) by failing to keep the employees informed of DMI's financial problems; (4) by failing to take action against DMI following the plant closing in April 1979; and finally, (5) by agreeing to a plant closing agreement which failed to adequately protect the membership's interests.

Once again, the Court notes that absent discriminatory, arbitrary or bad faith conduct on the part of the union, the Court will not engage in the process of "second-guessing" the union's decisions on these matters. *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1212 (6th Cir.1981).

Moreover, the Court believes that the facts of this case simply fail to establish any breach of the duty of fair representation. The evidence establishes that following the vote of the membership, union and company met in order to reduce to writing the modifications previously ratified. There is absolutely no evidence that the delay in reducing these proposals to writing was due to some bad faith on the union's part. Rather it appears from the evidence that the delay resulted from the company and union haggling over the language and substance of the modifications.[35] Thereafter, the company did take steps to modernize the plant. At the same time the union was active in insuring that employees' wages and benefits were not adversely affected by this modernization.[36] The evidence shows that the union did make an effort to monitor company efforts to modernize the Columbus plant. The union kept abreast of the investments approved by the Board of Directors as well as the new equipment purchases made by DMI. See union's Reply Memorandum in Support of Motion for Summary Judgment at 30–32. The Court concludes that the union's efforts to monitor the modernization of the Columbus plant cannot be considered arbitrary or unreasonable.

The facts do not indicate that the union acted to mislead the plaintiffs as to DMI's financial troubles. The union had no special knowledge concerning the company's financial plight. Rather, both the union and the employees were made aware of the company's economic troubles both prior to and following the ratification vote. The evidence shows that employees were given the same information as the union concerning the plant's problems through letters from management. For example, a letter in August of 1979 from management to employees stated that there had been "significant order reductions" and that production schedules for upcoming months [did] not look very strong ..." See Abbington Plaintiffs' Memorandum Contra DMI's Motion for Summary Judgment. In November 1979, the employees received additional information concerning the company's financial troubles. The plaintiffs were informed that "[t]he business outlook has become very poor as our country moves toward recession" resulting in "further layoffs and reduced work days." Moreover, the employees were told that two major customers of DMI were experiencing strikes and that financial losses were "very large." Abbington Plaintiffs' Memorandum Contra DMI's Motion for Summary Judgment, Ex. 4. In December of 1979 the company's financial

---

**35.** The union's Memorandum in Support of its Motion for Summary Judgment details the substance of the negotiations which took place when reducing the contract modifications to writing. See Union's Memorandum in Support of Motion for Summary Judgment at 13–14. The Court believes the facts show that the union was diligent during these negotiations. The Court also cannot conclude that the union acted arbitrarily in failing to obtain a reciprocal agreement from the company to modernize and keep the plant open since the evidence does not show that such a promise was ever made. *See* *also* Union's Reply Memorandum in Support of Summary Judgment at 29–30 and supporting affidavits.

**36.** The union brought in wage technicians to do time studies of the new grinding machines and to determine equitable incentive pays for employees assigned to these new machines. See Union's Memorandum in Support of Motion for Summary Judgment at 13–18. Grievances were also brought by the union concerning incentive pay. None of these facts are disputed. *Id.*

difficulties became even more apparent. The company was forced to shut down production lines and close the plant for a brief period of time. The Court frankly is at a loss to understand in light of the foregoing how the union's failure to independently inform the plaintiffs of these financial difficulties constituted a breach of the duty of fair representation. The union and the employees were never misled concerning the company's financial difficulties. The union's failure to independently communicate information concerning these difficulties was not arbitrary, unreasonable or in bad faith.

Finally, the union did not act arbitrarily in failing to take action against DMI following the plant closing or in negotiating a plant closing agreement. The union's decision not to challenge the plant closing can hardly be deemed arbitrary, especially in light of this Court's determination that the collective bargaining agreement did not prohibit the company from closing the plant.

The Court cannot accept plaintiffs' contention that the union "only protected its own interest and abandoned those of the membership" in negotiating the plant closing agreement. The evidence with regard to the plant closing agreement is fairly clear. In April 1980 the company announced its decision to close the plant effective May 1980. Shortly thereafter, the union began negotiating with the company over the plant closing agreement. At this point, the union correctly notes that it had very little bargaining leverage. Nonetheless, the union obtained an agreement from the company that guaranteed that the company would add to its pension fund trust whatever additional contributions were required to pay the full amount of the pension agreement.[37] Furthermore, the evidence shows that while the company initially proposed no severance pay be provided, the union succeeded in obtaining an agreement from the company providing employees with up to five weeks severance pay.[38] Finally, the evidence shows that even after the plant closing the union continued to file and process grievances. The union also organized a job fair in an effort to help members find future employment. On these facts, the Court can find no basis for concluding that the union acted arbitrarily, discriminatorily or in bad faith during the period following the ratification vote and plant closing.

Therefore, based on the foregoing, defendant union's motion for summary judgment is hereby GRANTED.

So ORDERED.

---

37. Plaintiffs concede that the union had "weak leverage" at this point. DiPaolo Plaintiffs' Memorandum in Opposition to Union's Motion for Summary Judgment. In addition, the union correctly notes that the pension fund trust was controlled solely by DMI and therefore any agreement on pensions could hardly be deemed to be "solely in the interest of the union." Furthermore, the union notes that union pension experts were called upon to evaluate the agreement's fairness with respect to pension benefits. See Union's Memorandum in Support of Motion for Summary Judgment at 17–23. These experts concluded that there was some doubt as to the company's obligation to pay these benefits under applicable law, i.e., Employee Retirement Income Security Act ("ERISA"). *Id.* Therefore, the union determined that it would be advantageous to get a commitment from the company to insure payment of an agreed-upon level of pension benefits in the plant closing agreement. The Court cannot conclude, nor have plaintiffs presented any evidence to support a conclusion that the

union's caution in this regard constitutes bad faith or arbitrary conduct.

38. See Union's Memorandum in Support of Motion for Summary Judgment at 17–23. Plaintiffs' allegations that the union secured virtually no severance pay and therefore violated the duty of fair representation are unfounded. See Abbington Plaintiffs' Memo in Opposition to Union's Motion for Summary Judgment at 5; DiPaolo Plaintiffs' Memorandum in Opposition to Union's Motion for Summary Judgment at 11. Interestingly enough, the plaintiffs offer no evidence to support this bald allegation nor have they presented any documentation as to why the severance pay provided DMI employees was unfair or unreasonable.

Absent some documentation, the Court can find no basis for concluding that the union's agreement with regard to severance pay constitutes a violation of the duty of fair representation.

## REMARKS BY LEO LADEHOFF

Thank you Mr. Mayor. Ladies and gentlemen I have come here today to talk with you about some decisions that we have to make, and decisions we have to make quickly. Decisions that will affect all of us. They will affect Dayton Malleable, our plant here in Columbus, and most importantly, you.

I am sure many of you realize that business at this foundry has not been as successful over the past few years as we all might have hoped. Let me take a few minutes to briefly give you some specifics on just what the exact situation is here.

To put it frankly, we're losing money on the operations here. A lot of money. We have a chart here which will demonstrate to you what I mean. It is difficult for you to see, I'm sure, but if you look at the red on the chart it indicates the losses, and the green on the chart indicates the profitable years. There are 25 years shown on the chart, and as you can see, in just the last 3 years this foundry has lost more money than it earned in the previous 25 years. We've lost over $13 million here in the last 3 years, and that money is lost forever. The past 6 months indicates that we are in another losing year. Jobs are being lost too. We have never recovered from the strike. Before that strike, we employed about 800 here—it's now down to 500.

Obviously, we cannot continue like this. In addition, the overhead costs here—cost of utilities, cost of keeping the equipment maintained, the paying of our bills is a staggering amount. Right now it's costing more than $200,000 every week to open this foundry. The bulk of that money, 85%, goes for employee fixed costs, such as workmen's compensation, unemployment compensation, Social Security, and fringe benefits such as insurance and pension costs. So what that means is just to open the doors here every Monday morning costs $200,000, regardless of whether we even turn on the motor or make a single casting.

On top of that, the overall need for malleable iron is shrinking each year. Industry in general is using less and less of this product now. They have converted their needs to nodular iron. Nodular iron is less costly to produce, simpler to process, and therefore the price is low, and it has some other interesting qualities. Nodular iron is something that we cannot make here with the equipment we have. The market for malleable iron, such as we make here, has decreased more than 25% the last 3 years or so. That means we are competing against many lower cost companies that manufacture malleable iron, and we're trying to sell in a market that is now one-fourth smaller.

That means increased competition, and increased competition makes it impossible for us to pass along a higher cost of business to our customers. We just can't raise our prices to pay the bills. If we did, our customers would simply move the patterns to a competitor who is willing to make this product at a lower price.

To a foundry who could give them the same castings, and that's because there's a lot of capacity around that wants this business and a lot less business to have. So we're fighting over it. And when you're in a fight, you can't raise prices. Now there are other factors that affect our performance here also. You know that we have old and obsolete equipment in many parts of the plant. We have outdated incentives, and we have a noncompetitive wage scale. To make a long story short, our back is against the wall at this division.

To show you just how this foundry compares with other foundries around the country that produce parts like ours, we have made a chart here that lists the average wage rates for 4 other comparable operations that we compete with every day.

I know it may be hard for some of you to see it, but we're showing the Lynchburg Foundry, a division of The Mead Corporation, at $6.30 an hour; Union Malleable at $7.23 an hour; Columbus, Georgia, a Columbus foundry, at $4.25 an hour; the Pennsylvania Malleable, a group of Gulf & Western at $5.36 an hour; and Northern Malleable at $6.55; and our March average at the Ohio division was $9.03.

You can clearly see how the wage rates here compare with other companies. These other companies compete with you every day for jobs and for your livelihood.

Now that brings us to the first of several decisions that we must make as a company.

One choice we have is to simply stop losing money here and close it down. The second choice for Dayton Malleable is to invest somewhere between $8–10 million to convert this plant to produce primarily nodular iron.

As I just mentioned, customers are demanding more and more nodular iron and less and less malleable iron. Caterpillar, for instance, one of your customers, has told us that they will tool up no new jobs in malleable iron. Now that trend will continue far in the future. Obviously, if that's what the customers wants, that's what he's going to buy. And if he can't get it from us, he'll simply buy it from other companies.

As for the first of those two choices, closing the foundry—it's an option that I, and I know that you, would like to avoid. I do not want to close this plant, but by the same token I cannot continue with an operation that loses millions of dollars each year, as we've shown on the chart.

Now I know you've heard this kind of talk before. But closing this foundry is a choice that we have got to study long and hard. I've come here today to tell you this personally so there is no doubt as to the seriousness of our situation here.

We must become competitive in the market and to become competitive we must get our costs down, or at least keep them from going up, and we must increase our ability to efficiently produce more of the kinds of products our customers need. If we are unable to do that, we have to close it.

That brings us to the second choice—to convert this plant to nodular iron production. On the surface, that choice seems to be the best for everyone. For our customers, for Dayton Malleable and for our employees. Unfortunately, it isn't that simple. We just can't walk up to it and say, let's start making nodular iron and walk in here next week and start doing it.

It takes time to convert the plant. It takes money to convert the plant, and if the choice is to convert this plant, it will cost $8–10 million. Now, the Board of Directors of our company who represent the people who own it, the stockholders, would first have to give us permission to spend that kind of money. They will not be willing to approve that kind of expenditure unless we can show them this foundry can be competitive, and it's simple—nobody would bet on a loser.

If they did approve the conversion, it would take between 2 and 3 years to complete the changeover, and that would include the purchase and installation of new electric furnaces and other allied equipment. Some equipment, such as high-speed grinders, for example, could be purchased immediately and help improve efficiency. I would like to emphasize that during this 2 to 3 year period if we are to convert this plant we would not shut down—we would continue to operate with little interruption. In fact, I think it will be critical that during this transition period we actually increase our daily production in addition to holding down our costs. We have to keep this plant alive, we have to give ourselves the opportunity to have a future.

During this period of time, there would have to be some important steps taken to help keep our losses to a minimum and to prove that the decision to invest here and convert was a good one.

That brings me to other decisions that we'll have to make, and let me tell you what they are.

First, as you know, Columbus is on a joint contract with our Ironton plant, operating under a contract that expires in December of 1980. We need to separate that agreement. We have to operate separately if we are going to increase our business. We have talked to our customers, and generally they are unwilling to give us additional orders and business and enough product in order to tool up enough new work as long as the labor contract is tied to Ironton.

They learned the hard way during the last strike.

Second, we need to extend the terms of the existing contract for another full year in Columbus only till December, 1981. That extra year is needed and would assure us the time, stability and costs we're going to need to try to get increased business at the plant, and

Third, we need to continue the present wage level without increase for the duration of the extended contract. That would become effective after the June 26th cost-of-living adjustment, however. In other words, after the upcoming cost-of-living adjustment we would hold wages for the duration of the contract. We're asking you to share this burden with us. But as we showed you a moment ago, you still would be farther ahead than the other foundries that you're competing with.

Fourth, we're asking you to cooperate in helping us and in devising new production methods for the shop and accepting new time studies and standards that will be arrived at to make our incentive rates more equitable. Part of becoming more effective means we must become more efficient. So just as we need better machinery, we need equitable incentive rates. Rates that will assure fair pay for a fair day's work throughout the entire plant.

We would approach the new setting of standards in a very objective and fair way to the best of our ability by using outside subcontractors, like say, industrial engineering specialists trained in the proper setting of rates to come in and establish rates in the plant. We would ask the United Steelworkers to send in their industrial engineering experts to qualify those rates in order to be as fair as possible.

I know that's a lot to ask, but those steps are critical if we are to survive during the time it will take us to switch our manufacturing operations here to nodular iron. They are critical to convince our Board of Directors to allow us to invest 8 to 10 million new dollars into this plant.

These 4 steps are not means of taking something away from something you have now. We're not talking about asking for a cut in the hourly rate. No one is going to lose existing benefits.

What we're asking for in the next 2 years is to just stay where we will be in July. To tread water, to narrow the gap between us and the competitors so we can get enough business in this plant to operate. Now we know that that in itself is a sacrifice, but it's a sacrifice that must be made if we're going to turn this foundry into a source of quality castings that are competitively priced that our customers will buy.

I might add that if for any reason the foundry begins to show a lot of progress during this period and begin to make money, we'll revise our agreement and pass along any benefits to you that we can, and we're going to show good faith by keeping your committee and the Steelworkers informed of any progress made here.

We're not looking to get back the full $13 million before we do that, I might add. That's gone forever. What we have to do is to get the nose above water, so that it has a future and so that it can make a return on its investment in the future. We're not the first manufacturing operation run into trouble. It's happening more and more every day. Right here in Columbus others such as Columbus Malleable and Federal Glass have faced similar situations and simply closed up.

It's not going to be easy for us either, but I'm confident that with the 4 points that I've outlined here we have at least a chance to make this plant successful once again. Now it's going to take cooperation, hard work, and a competitive spirit from all of us. And from what I've seen in this shop, you have that competitive spirit. If I didn't think that, I wouldn't be standing here today. I think we can do it.

Let me summarize where we stand. Dayton Malleable must decide whether to close the plant or convert it to the production of nodular iron. If we're going to convert it, we must separate from Ironton, extend the contract, and hold wages and

benefits until we can complete the process and become profitable and while we are converting we must cut costs and increase the volume.

As I said earlier, you've heard this kind of talk before I am sure. Let me assure you that my purpose here today is not to try to scare you into something. I came here simply to discuss the facts with you and to outline what must be done to make the choice to survive possible.

Now the choice is yours—if you vote to support us, we're going to do our best to turn this plant into a winner so everybody here can win. Thank you.

## QUESTIONS AND ANSWERS

### Answers by Leo Ladehoff

I will answer any questions you may have, and when that's finished, we'll ask the management members to clear out in case you want to have a chat with your Steelworkers leadership here. I will try to answer any questions I can. Yes sir—

Q: [question inaudible]

A: Well, I don't know about that. I can tell you that we'll do our best to give you fair treatment and I'm not familiar with that particular problem. We'll look into it.

Q: You said that there would be no cut in hourly rates [remainder of question inaudible].

A: I can't answer that—there could be some—it could go both ways—we just need to reevaluate a number of the standards in the plant and [phrase inaudible] change the methods around. There's gonna be quite a lot of different jobs.

Q: What about the existing standards?

A: Some of them will be reduced if that's what the study indicates—some of them could be increased.

Q: You say that it will be nodular iron.

A: Well, some of them will be looked at before that because that will take us, you know, like a year and a half, 2 years, to get that accomplished before we can get new furnaces in, things like that. Yes sir.

Q: [question inaudible]

A: Nodular iron has some interesting characteristics, such as you can make more intricate shapes—more difficult things to make and—it has a lot of the same characteristics as malleable but it has less steps in the process. Yes.

Q: You said it would take anywhere from a year to 2 years to convert. [remainder of question inaudible]

A: Okay—he wants to know if this is gonna take a long time, and as far as the melting department what will be the change in jobs. The first thing we have to do to make nodular iron is new electric furnaces which is a sort of a different kind of a setup, and once we start making nodular iron we will also be making malleable iron at the same time, however, we'll make both for a while in order to keep our customers, so there will be a shift at first. From this point of view that nodular iron takes very little heat treating and very little straightening, so that the heat treat department and the straightening department or pressing department once we get up to 100% nodular it will be reduced substantially and there will be more in the molding area and the melting area as we move into 2 shifts in that area so that we hope that we would be successful in getting more business to create more jobs up front because some of those jobs will not be needed to make nodular iron.

Q: [first part of question inaudible] The last time we switched to nodular it was out of our department. Will the people in the melting department have the opportunity to get into this field?

A: Yes, the last time we tried it was that Fisher converter process which did not work. It was a research project. When we put in electric furnaces here, we will put them in while we're still operating with the air furnace. At some point we'll cut over and shut off the air furnace completely and the folks running that melting department will have to run the new one. Yes sir—

Q: [first part of question inaudible] How about the cost of living when we get over into the 3rd year?

A: Dick says that we said we wouldn't lose any wages—what about the cost of living in the 3rd year. What I'm telling you is that we're not asking you for a dollar an hour pay cut from your current wages. The hourly rate is not being adjusted, but we are asking to hold, in effect the—no further increases of any kind from now until the end of that time. We just can't handle it. No cost of living after the June 26.

Q: [very short inaudible question]

A: And it capped off anyway at the maximum is what they are saying, in the 3rd year.

Q: We have another year to go on.

A: But its cap already was used up, I think, is what he is saying. Whereas, the contract says we have a cost of living up to about 37 or 38¢ and that is all used up after this next increase. [last phrase of response inaudible]. Yes sir—

Q: [question inaudible]

A: He's asking when we draft our letter of agreement that describes this will each employee get a copy of that. I have to defer what is our practice on that.

Q: Yes, the law says so.

A: It's a part of the contract, and if you get a contract you should get the letter too. We want to keep everything up front on the table if we can, so you'll get one I know. Yes sir—

Q: [question inaudible]

A: What about the layoffs? I hope we don't have any. I know one thing—if we don't go ahead, we're gonna have a lot of them. If we go ahead, we're going to try to make this conversion without any big layoffs or interruption. That's going to be tricky because what we have to do is to increase our business so that we employ more. We believe that there are some customers that will cooperate with us once they know that we're going to do this and that we are separating ourselves here from the ironton contract, and the secret is if you have more business on the one side while some jobs are changing on the other, then everything stays the same. Now I can't guarantee it because the country today is in a difficult economic condition, you hear and all day long on the television, on the radio, that we seem to be coming into a recession period for a year or so, and we're already starting to see it at Dayton Malleable, and some of our customers' products aren't selling so good—they're ordering fewer and fewer pieces at some of our plants. It hasn't hit here bad yet but we're catching hell to stay in the automotive side, and I can't guarantee there will be no layoffs, but it's not the intention of this program to create layoffs. We're going to do our best. Yes sir—

Q: You said that the board of directors has to agree on this. [last part of question inaudible]

A: He's asking what about the Board of Directors, when will they decide, just thinking a minute. The next meeting of the board of directors is in August, and that's when we would get a decision from them and that will give me time to lay out all the justifications for them. [phrase inaudible] I think that the changes are good, that they will cooperate with me, but there is that difficulty of our economic situation in the country—and if that continues to get worse [phrase inaudible] then I have got problems.

Q: I'm having trouble with the separation of the two locals. Do I understand this to be indefinite, or is this until the company starts back to making money?

A: We think it has to be indefinite in terms of separation because the customers are fighting us on that—whether they lay down later I don't know. Yes sir—

Q: [question inaudible]

A: All I can tell you is if the company started to make some money, then

we're going to try and pass some of it on. The economy's gotta go; we gotta get competitive and we gotta get business into gear and do a good job of it and if we can get enough of the activity up, we can make some money [phrase inaudible]. We have to ultimately make a satisfactory profit here to make a return on the investment. That's what business is all about. If we can't do that, we're dead. We're all in the same boat trying to accomplish the same thing.

I'll close this meeting, and I'll ask those people that are not members of the union to leave and those of you who wish to stay and talk to the union leadership are welcome to do so. Thank you.